IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT

OF GEORGIA, ATLANTA DIVISION

STATE OF GEORGIA

TANESHA REMBERT,                          )
                                          )
          Plaintiff,                      )
                                          )
v.                                        ) Civil Action File No. :
                                          )
                                          )   12-CV-02811-JOF-JSA
MOUNT VERNON INTERNAL MEDICINE,           )
LINDA BOWER, DR. SHARON P. TINANOFF,      )
DR. CHARLES D. COHN, DR. JEFFREY P.       )
POLEKOFF,                                 )
                                          )
          Defendants.                     )


        The deposition of JEFFREY P. POLEKOFF, taken at the

    instance of the Plaintiff, pursuant to stipulations

    contained herein; the reading and signing of the

    deposition reserved, before Bruce Niedermeyer, Certified

    Court Reporter, at 2:00 p.m, on April 18th, 2011, at 900

    Circle 75 Parkway, Suite 850, Atlanta, Georgia.

A P P E A R A N C E S

FOR THE PLAINTIFF:

        VALERIE VIE, Attorney at Law
        5682 Palazzo Way
        Suite 102
        Douglasville, Georgia  30134

FOR THE DEFENDANT:

        CHIAKA ADELE, Attorney at Law
        900 Circle 75 Parkway
        Suite 850
        Atlanta, Georgia  30339-3084

DEPONENT                                          PAGE


JEFFREY P. POLEKOFF
Direct Examination by Ms. Vie .........................4

EXHIBITS                                          PAGE


Exhibit No. P-1 TIMEKEEPING/PAYROLL 406    ..........27
                SUMMARY DISMISSAL

Exhibit No. P-2 EMPLOYMENT POLICIES AND ..............45
                PRACTICES

Exhibit No. P-3 701 EMPLOYEE CONDUCT AND WORK ........46
                RULES

Exhibit No. P-4 WORKING CONDITIONS AND HOURS ..........55
Certificate of Reporter .............................61

<pre>
 1                    P R O C E E D I N G S
 2   Whereupon,
 3                    JEFFREY P. POLEKOFF
 4   was called as a deponent herein and, having first been duly
 5   sworn, was examined and deposed as follows:
 6                    DIRECT EXAMINATION
 7   BY MS. VIE:
 8        Q     In the United States District Court for the Northern
 9   District of Georgia, Atlanta Division:  Tanisha Rembert,
10   Plaintiff, versus Mount Vernon Internal Medicine, Linda Bower,
11   Dr. Sharon Tinanoff, Dr. Charles Cohn, Dr. Jeffrey Polekoff.
12   Civil Action No. 12-CV-02811-JOF-JSA.  Doctor, if you could,
13   please state your name for the record, please.
14        A     Jeff Polekoff.
15        Q     Could you state your address.
16        A     My home address?
17        Q     That's correct.
18        A     558 Gramercy Drive, Marietta, Georgia 30068.
19        Q     Could you spell that for me, please.
20        A     Marietta?
21        Q     Your street address; I'm sorry.
22        A     Oh, Gramercy?  G-r-a-m-e-r-c-y.
23        Q     What is the practice address?
24        A     755 Mount Vernon Highway Northeast, Suite 400, Sandy
25   Springs, 30328.
</pre>

1    Q    Is there a separate entrance and exit for the
2    employees there, as opposed to the customers or clients;
3    patients?
4    A    I'm not clear what --
5    Q    Do the employees have a different entrance than the
6    general patients?
7    A    Different medical insurance?
8    Q    Entrance.  Meaning, how do they access the building.
9    A    Oh, different entrance.  Yes.
10    Q    Is there a access gate to that practice?  Do you have
11    to gain access to the employee entrance by a gate?
12    A    No.  There's a door.
13    Q    How do you get your car in?
14    A    Oh.  You get your -- you -- there's a gate to get
15    into the parking lot.
16    Q    Who does the practice lease the premises from; what
17    company?
18    A    It's -- I think it's called Health Care REIT.
19    Q    How do you spell the last word?
20    A    R-E-I-T.
21    Q    What is their address?
22    A    I don't know.
23    Q    Are you currently married?
24    A    I am.
25    Q    What is your wife's name?

```
1       A    Valerie.

2       Q    How coincidental, huh?  Is she also Polekoff or a

3  hyphenated last name?

4       A    No, she's Polekoff.

5       Q    Have you ever been divorced?

6       A    I have.

7       Q    What is your ex-wife's name?

8       A    Elizabeth.

9       Q    Last name?

10      A    Jones.

11      Q    Why were you divorced?

12      A    Irreconcilable differences.

13      Q    Why would she say you got divorced?

14      MS. ADELE:  Objection; calls for speculation.

15  BY MS. VIE:

16      Q    You still have to answer.

17      A    We didn't get along.

18      Q    Do you have any children?

19      A    I do.

20      Q    Do you have any children of your present wife?

21      A    I do.

22      Q    How many?

23      A    Two.

24      Q    What are their names?

25      A    Sy and Seth.
```

| | | |
|---|---|---|
| 1 | Q | Could you spell it for me, please? |
| 2 | A | Sy is S-y. Seth is S-e-t-h. |
| 3 | Q | Last name Polekoff? |
| 4 | A | Polekoff; correct. |
| 5 | Q | Did you have any children from your previous |
| 6 | marriage? | |
| 7 | A | I do. |
| 8 | Q | What are their names? |
| 9 | A | Aaron and Jordan. |
| 10 | Q | Last name Polekoff, or would it be Jones? |
| 11 | A | Polekoff. |
| 12 | Q | Have you ever been arrested? |
| 13 | A | No. |
| 14 | Q | Have you ever been convicted of a crime? |
| 15 | A | No. |
| 16 | Q | Prior to working for Mount Vernon, where did you |
| 17 | work? | |
| 18 | A | At Gwinnett Medical Center. |
| 19 | Q | Why did you leave Gwinnett Medical Center? |
| 20 | A | I no longer wanted to practice hospital medicine. I |
| 21 | wanted to get back into an office. So... | |
| 22 | Q | Have you ever been fired or asked to resign? |
| 23 | A | No. |
| 24 | Q | Are you currently on any medications? |
| 25 | A | No; other than cholesterol medicine. |

| | | |
|---|---|---|
| 1 | Q | Cholesterol medicine? |
| 2 | A | Mm-hmm. |
| 3 | Q | Have you ever had any hospitalizations? |
| 4 | A | Only for a dog bite many years ago. |
| 5 | Q | You were hospitalized for it? |
| 6 | A | Yeah. Well, I had an infection in my hand. |
| 7 | Q | Have you ever filed suit against anyone or been |
| 8 | | involved in a legal action of any sort? |
| 9 | A | Just over the dog bite years ago. |
| 10 | Q | Okay. Tell me about that. When you say years ago, |
| 11 | | when was it? |
| 12 | A | 1980s; probably 1987 or '88. |
| 13 | Q | Who did you sue? |
| 14 | A | The owner of the dog. |
| 15 | Q | Did you get any monetary or financial damages for |
| 16 | | that? |
| 17 | A | Just medical expenses; that's all I was looking for. |
| 18 | Q | Was that by settlement or trial? |
| 19 | A | Oh, it just settled. |
| 20 | Q | Has anyone ever filed a lawsuit against you? |
| 21 | A | No. |
| 22 | Q | Are you excluding the current one? |
| 23 | A | Yes. I mean, before this. |
| 24 | Q | Have you ever had a nervous breakdown or been |
| 25 | | hospitalized for any psychiatric problems? |

```
 1      A     No.

 2      Q     Have you ever undergone any type of psychological

 3   counseling?

 4      A     No.

 5      Q     Do you have any anger issues?

 6      A     No.

 7      Q     Have you ever exploded or caused any damage to

 8   property?

 9      MS. ADELE:   Objection to the form; exploded something?

10   BY MS. VIE:

11      Q     Exploded and caused any damage to property?

12      A     No; other than trying -- calmly trying -- to

13   sometimes get into a parking area if the arm was not coming --

14   if the parking arm was stuck and there's no other access to my

15   work.   But it wasn't out of anger, it was just out of trying to

16   get to see my patients.

17      Q     Okay.   So you have caused damage to property?

18      A     Not intentionally.   I tried to lift an arm up, and

19   it's -- it was very fragile and it just came off.

20      Q     So, let me be clear for the record.   Yes, you have,

21   but by mistake; is that what you're saying?

22      A     Yes.

23      Q     And wouldn't you say that this mistake has happened

24   at least twice?

25      A     It happened two times where I try to lift the arm up,
```

9

1   and the arm -- the piece of wood came off the arm.

2       Q    What were the dates of the two times that you --

3       A    I don't remember; not recently.

4       Q    I'm not quite clear on what you're trying to tell me.

5   There is a gate -- describe this for me.  There is a gate to

6   access the parking lot to get to your office; correct?

7       A    Correct.

8       Q    Okay.  And sometimes the gate malfunctions?

9       A    Correct.  So, I simply try to lift the gate up so I

10  can pull through, because backing out -- it's a blind backout.

11  So, if I back out, I could get hit by a car and killed.  It's

12  very hard to turn around once you commit to that area.  So,

13  what I did is I lift up on the gate and try to drive through.

14  When I lifted up on the gate, the wood is very fragile -- they

15  have replacement wood and it screws right in.  And when that

16  happened, a couple of times the wood would tear off.

17      Q    So, after that happened the first time, you did it

18  again?

19      A    Over a year later, yeah; when it malfunctions.

20      Q    How much did they charge you for the damage to the

21  gate?

22      A    I'll don't think there was a charge.  I think that

23  the building owners realized that they had a -- it was a

24  liability for them to have a gate that was malfunctioning that

25  would engender people -- the need for people to back up into

                                                        10

1   oncoming traffic without visibility.

2      Q   So, it's your testimony that they realized they had

3   the problem? Who is they, by the way? Who are we talking

4   about?

5      A   I'm not sure. It would probably be Health Care REIT

6   that had the parking lot.

7      Q   Okay. Is it your testimony that they were not angry

8   about this occurrence?

9      MS. ADELE: Objection to the form.

10     THE WITNESS: I didn't have any interaction with them.

11  BY MS. VIE:

12      Q   Who did have the interaction?

13      A   My office manager.

14      Q   Who would that be?

15      A   Linda Bower.

16      Q   On both occasions Linda Bower handled the situation?

17      A   I believe so.

18      Q   Mahogany Thomas, a black female that was employed at

19   your practice, that was hit by you; do you know who she is?

20      A   I was not -- I did not hit Mahogany.

21      Q   Are you denying you hit her?

22      A   I did not hit her.

23      Q   Okay. We'll get back to that. Do you know where she

24   is?

25      A   Do I know where she is?

```
1        Q    Yes.

2        A    Not at this time, no.

3        Q    Did you offer her any benefit -- money -- at all not

4   to talk to me?

5        A    Absolutely not.

6        Q    What was the date that she was hit that you didn't

7   hit her?  What was the date of that occurrence, sir?

8        A    I don't remember the date.  And I didn't hit her.

9        Q    Do you recall the year?

10       A    I think the incident you're referring to was in 2011,

11  but I'm not sure.

12       Q    Is there anything that would refresh your

13  recollection as to when the date was?

14       A    I'm not sure what that means.

15       Q    Anything that can help you remember?

16       A    The exact date?

17       Q    Sure.

18       A    No.  I mean --

19       Q    Nothing could help you remember?

20       A    Nothing could help me remember?  Not unless I -- my

21  memory was refreshed by somebody telling me what date it

22  happened.

23       Q    Did you make a report?

24       A    Did I make a report?  No.

25       Q    Was a report made?
```

```
1    A    Not to my knowledge.

2    Q    Well, let's get into this.  According to your

3    admissions, you indicate -- I really couldn't wait for this,

4    because I'm saying admit that you hit Mahogany Thomas, or --

5         MS. ADELE:  May I see what you're referring to, counsel?

6         MS. VIE:  It would be "Request for Admissions" document

7         filed on the 11th of January, 2013.

8              (Whereupon, the attorney presented a document to the

9         witness.)

10             (Whereupon, the witness viewed the exhibit.)

11        THE WITNESS:  Right; I denied that I hit Mahogany Thomas.

12   BY MS. VIE:

13   Q    I'm going to ask you the question.  I just wanted to

14   refresh your recollection.  You denied you hit her?

15   A    I didn't hit her.

16   Q    Okay.  But you did not deny that you caused a object

17   to hit her; correct?

18   A    By accident.

19   Q    Okay.

20   A    I would never do anything to hurt Mahogany.  I

21   happened to like her, and I thought she was a really nice

22   person.  I certainly didn't want to inflict any harm on her.

23   Q    Okay.  Now, you say, "the defendant admits there was

24   a incident when he accidentally touched an object, which then

25   caused another object to come in contact with Ms. Thomas."
```

1    A    There was a loose --

2    Q    So -- yeah.  That's exactly why we're here.  Tell me
3    exactly how this happened.

4    A    There was a loose melamine shelf that we put to hold
5    cards on top of a melamine desk.  Mahogany and Reandra Roberts,
6    who is my nurse, were disputing a point and arguing over a
7    point that related to patient care.  I asked -- I said, "Guys,
8    stop," and I put my hand down, and the shelf slid off the
9    tabletop.  It was a very light, thin, glued-together melamine
10   shelf, and it slid off and touched Mahogany, and I apologized.
11   I said I felt terrible and I didn't mean for it to hit
12   Mahogany.

13        I would never do anything to hurt Mahogany.  I had a
14   -- I thought she was a great person.  It was just -- I became
15   frustrated with an argument over a patient's neck size.
16   Mahogany was insisting it was 38 inches, and Reandra was trying
17   to explain to her she was using the centimeters side of the
18   tape.

19   Q    So you do admit you were frustrated with Mahogany at
20   that time?

21   MS. ADELE:  Objection; mischaracterizes the witness'
22        testimony.

23   THE WITNESS:  I was frustrated with the fact that Reandra
24        was her supervisor.  They were arguing over something that
25        was, to me, a simple mistake that just needed to be --

                                                           14

1     they needed to move on.  I just told them to stop.  But I

2     didn't ever want to hurt Mahogany, that's for sure.  And

3     Mahogany understood -- understood that.

4  BY MS. VIE:

5     Q    You sure Mahogany understood that?

6     A    It was my impression.

7     Q    How did you get that impression?

8     A    She said, "I understand," and, "I know it was an

9  accident."

10    Q    Would you be surprised if she contacted me, very

11 upset about it?

12    MS. ADELE:  Objection.  Objection to the form.

13 BY MS. VIE:

14    Q    You have to answer.

15    A    I would be surprised.

16    Q    The frustration that you felt at the time; was it

17 because of the argument that was going on or because she

18 measured in centimeters and not millimeters?

19    MS. ADELE:  Objection to the form.

20    THE WITNESS:  Centimeters instead of inches?  It was

21    because she made a simple mistake and it was

22    understandable, but she was arguing with Reandra, and

23    we -- it was impeding patient care.  And I just felt that

24    they should move on.  It was not a necessary disagreement.

25 BY MS. VIE:

                                                            15

1    Q    How long was this board that flew up in the air and
2    hit Mahogany?

3         MS. ADELE:  Objection to the form.
4    BY MS. VIE:

5         Q    Is that not what you testified to?  That you hit --
6         A    No.  I put my hand down on the tabletop --

7         Q    And how hard did you do that?  Because the record's
8    not going to be able to see that.

9         A    Just -- I slapped my and down (indicating) like that.
10   And, you know, like that (indicating), and I said, "Enough!"
11   And the melamine board slid off the -- slid off, and it just
12   fell down.

13        Q    How big is this board?
14        A    Two and a half feet.

15        Q    Two and a half feet?
16        A    It's just a little shelf that goes on top of a table
17   so you can put a few papers and physician's cards.

18        Q    It's two and a half feet long?
19        A    Well, wide.  It's only -- depth is probably only
20   about, maybe, ten inches.

21        Q    Two and a half feet wide; ten inches long.
22        A    Or ten inches deep; yeah.

23        Q    And this shelf was sitting on a flat surface?
24        A    Yes.

25        Q    And what was that flat surface?

| | | |
|---|---|---|
| 1 | A | It was just a melamine cabinet. |
| 2 | Q | I'm not understanding.  It's on the table -- |
| 3 | A | Right.  A table like this. |
| 4 | Q | Okay. |
| 5 | A | It's just a big melamine cabinet with drawers, and |

A    It was just a melamine cabinet.

Q    I'm not understanding.  It's on the table --

A    Right.  A table like this.

Q    Okay.

A    It's just a big melamine cabinet with drawers, and
that's kind of the nurses' station.  And then we had this extra
melamine shelf that was just, you know, a small shelf I put
there to give us a little extra surface to stack cards and
stuff so it was right there.

Q    Okay.  And how thick is it?  You're saying it's two
and a half feet wide --

A    Oh, it's thickness is probably -- it's real thick.
It's like -- it's probably 5 millimeters thick to 8 millimeters
thick.

Q    And where on Mahogany's body did the shelf that you
hit that caused contact with--

A    I think it slid off the tabletop and touched her leg,
because it just, like, went off the edge.

Q    It slid off the tabletop and hit her leg?

A    I think that's where it hit.

Q    You're not sure?

A    Well, it happened pretty quickly.

Q    Did you ask?

A    Did I ask?  I asked, "Are you all right?  I'm sorry."
She said, "I'm fine."

| | | |
|---|---|---|
| 1 | Q | How long was Mahogany working for you prior to this |
| 2 | incident? | |
| 3 | A | I'm not sure of the exact time. |
| 4 | Q | You don't have to be exact; your best recollection. |
| 5 | A | Several months. |
| 6 | Q | Several months? |
| 7 | A | I mean, she worked at different stations.  I'm not |
| 8 | sure. | |
| 9 | Q | How long had she worked for the practice? |
| 10 | A | Six months; I'm not sure. |
| 11 | Q | Couldn't have been a year or two? |
| 12 | A | It could have been close to a year.  I don't think it |
| 13 | was -- I don't think it was two years.  Maybe closer to the -- |
| 14 | it could have been between six months and a year.  I don't |
| 15 | think it was more than that. |
| 16 | Q | How long did she work for you after the object that |
| 17 | you hit came into contact with her person/leg but you're not |
| 18 | sure? |
| 19 | A | Oh, I think about several months. |
| 20 | Q | After? |
| 21 | A | After. |
| 22 | Q | So it's your testimony that you think she worked for |
| 23 | you several months after this incident? |
| 24 | A | Yeah.  About -- yes. |
| 25 | Q | I'm not sure that I asked you, but you guys did not |

18

1   make any form of report for that?

2        MS. ADELE:  Asked and answered.

3        THE WITNESS:  Not to my knowledge.

4   BY MS. VIE:

5        Q    Pardon?

6        A    I had no part in making a report, so I'm not sure if

7   a report was made or not.

8        Q    Did anybody ask you any questions for their report,

9   if you didn't make it?

10       MS. ADELE:  Do you understand the question?

11       THE WITNESS:  If somebody made an incident report or some

12       kind of report?  No.  I mean, I don't remember any report.

13       I mean, I remember apologizing to Mahogany, saying I

14       didn't mean to knock the shelf off.  And, you know, that

15       was it.

16  BY MS. VIE:

17       Q    Why was Mahogany terminated?

18       A    She was, like -- oh, she was, like -- oh, because

19  there's no work; no more work for her.

20       Q    Did she receive a separation notice?

21       A    I don't know.

22       Q    You indicated that you were frustrated because she

23  was talking back to whom?

24       A    Reandra Roberts.

25       Q    Is Reandra Roberts white or black?

1    A    She's -- she's African-American.

2    Q    Was Reandra Roberts her supervisor?

3    A    Yes.

4    Q    How long had Reandra Roberts been her supervisor?

5    A    Since she was there. Reandra's been the head MA

6    since before I even joined the practice.

7    Q    Has there been any white girls that came in contact

8    with a board that you hit that mysteriously hit them?

9    A    No, that was only one incident where that happened.

10    Q    So, I guess your answer would be no? No white girls

11    have been hit by any boards that you accidentally hit that hit

12    them?

13    A    We don't have -- there's nobody that's Caucasian that

14    even works in any of our stations. All of our employees that

15    work in our stations that are MAs are all African-American.

16    Q    I understand that. But my question is: Has there

17    been any white girls that have been hit by boards or objects

18    that you accidentally hit to cause contact with their person?

19    MS. ADELE: Objection to the form.

20    THE WITNESS: I don't understand what you're saying. I've

21    never knocked a shelf off except for that one incident

22    where that shelf fell off.

23    BY MS. VIE:

24    Q    So the answer would be no?

25    A    The answer would be --

20

1    MS. ADELE:  Objection; asked and answered.

2    MS. VIE:  He has not answered yes or no.

3    MS. ADELE:  He has responded to your question.

4    BY MS. VIE:

5    Q   Okay.  My question is -- I'm going to go slow.  So

6    there has not been any white females that have been hit by

7    objects that you accidentally hit?

8    MS. ADELE:  Objection; asked and answered.

9    BY MS. VIE:

10   Q   You still have to answer.

11   A   There have been no Caucasian females that have been

12   struck by a shelf or any other African-American employees that

13   were struck by a shelf.

14   Q   Do you know what Medicare fraud is?

15   A   I do.

16   Q   Do you know what Medicare fraud is?

17   A   Medicare fraud?

18   Q   Yes.

19   A   I know what Medicare fraud is.

20   Q   What is your understanding of what those are?

21   A   It's billing falsely when you haven't taken care of a

22   patient.

23   Q   How does that happen; to bill falsely?

24   A   How does it happen?

25   Q   Yeah.  I mean, how would that happen; when you say

1  billing falsely?

2      A    If you're not providing care and billing for it.

3      Q    Would it be Medicare fraud to provide some services

4  and charge for extra services?

5      MS. ADELE:  Objection.

6  BY MS. VIE:

7      Q    Would it be?

8      A    If someone knowingly provided services and tried to

9  bill Medicare for services they didn't provide, it would be

10  fraud.

11     Q    You use the word knowingly, and that's odd, so just

12  bear with me for a minute.  What is your understanding of

13  knowingly?

14     A    Someone intentionally bills Medicare for services

15  that they're not entitled to payment for.

16     Q    Based on your understanding, what would be some other

17  examples of Medicare fraud?

18     MS. ADELE:  Objection.

19     MS. VIE:  Basis?

20     MS. ADELE:  You are asking him to speculate.

21     MS. VIE:  No, I said from his understanding.

22     MS. ADELE:  From his understanding?

23  BY MS. VIE:

24     Q    From your understanding, what would be some other

25  examples of Medicaid fraud?

1       A       Medicaid or Medicare?

2       Q       Both.  Let's take them separately.  You want to do

3    them differently, or --

4       A       No.

5       Q       Okay.

6       A       Any fraud, any insurance fraud; it would be phantom

7    patient care, where patients aren't seen in your office, and

8    billing --

9       Q       Hold on, just a second -- phantom patient care.  And

10   this means they're not there?

11      A       They're not real people.

12      Q       Okay.  Another example?

13      A       That would be pretty much it.  Just billing for

14   things that -- when you don't provide care for those.  You

15   don't provide those services.

16              (Whereupon, the attorney presented a document to the

17          witness.)

18              (Whereupon, the witness viewed the exhibit.)

19          MS. ADELE:  Do you have a question about the policy

20          specific to the handbook -- document in the handbook?  Do

21          you have an extra copy so he can refer to it as you ask

22          him the question?

23          MS. VIE:  I do not.

24          MS. ADELE:  Do you want me to make a copy?  I'll get you a

25          copy.

1    THE WITNESS: Here you go.

2    BY MS. VIE:

3        Q    For the record, I handed him a Mount Vernon Internal

4    Medicine internal document, and it's entitled "TIMEKEEPING/

5    PAYROLL; 406 SUMMARY DISMISSAL. There are certain actions

6    which will result in summary dismissal, that is dismissal

7    without notice or severance pay." There are 1, 2, 3, 4, 5, 6

8    items on this document. One is "FORGERY OF DOCUMENTS," that I

9    would like to bring your attention to. "Discovery of forgery

10   of documents by an employee will result in summary dismissal."

11   That is a policy you have there at Mount Vernon?

12       A    I would assume so. I haven't read that, but I've

13   read it now.

14       Q    And you work for them, and this is their document

15   that was provided by your lawyer?

16       A    Mm-hmm.

17       Q    So, it would be safe --

18       MS. ADELE: Objection; you don't work for Mount Vernon

19       Internal Medicine.

20       THE WITNESS: No.

21   BY MS. VIE:

22       Q    At this time you worked for Mount Vernon Internal

23   Medicine?

24       A    I was a partner.

25       Q    Okay. And you worked in that firm; the firm with the

                                                              24

1  partners?

2      A    I was.  I was one of the partners.

3      Q    Okay.  And as this document -- as one of the

4  partners, it would be against company policy to forge a

5  document; would it not?

6      MS. ADELE:  Objection to the form.

7  BY MS. VIE:

8      Q    Would it be against policy that you just read here if

9  someone forged documents?

10     MS. ADELE:  An employee.

11     THE WITNESS:  If an employee forged documents.

12  BY MS. VIE:

13     Q    So if you forged documents, or someone else the

14  practiced did, it wouldn't be forgery?

15     MS. ADELE:  Objection to the form of this question.

16     THE WITNESS:  I'm not really sure what you're alluding to

17     --

18  BY MS. VIE:

19     Q    Okay.

20     A    -- to be honest with you.

21     Q    I'm going to go slow because I know I need to go slow

22  when she objects.  You want me to ask the question again?  I'll

23  do that; no problem.  It says that discovery of forgery of

24  documents by any employee will result in summary dismissal;

25  correct?  Isn't that what it says?  I'll pass you the document.

```
1       A    Right; I saw it.

2       Q    Okay.  You said you didn't understand so if you want

3   to take a chance to read it you can.

4       A    Mm-hmm.

5       Q    Okay.  So, if they did that, they would be summarily

6   dismissed according your policy, or at least they should be?

7       A    All right.

8       Q    Okay.  Now, I asked the question if anyone did it

9   would it be against your policy for someone other than an

10  employee -- a partner -- to falsify or forge documents?

11          MS. ADELE:  Objection.

12  BY MS. VIE:

13      Q    You still have to answer.  She can't stop you from

14  answering.  She can object.

15      A    Yeah, it would obviously not be considered

16  appropriate if someone forged documents.

17      Q    Okay.  That wasn't that hard.  I'm not trying to

18  trick you.

19          MS. ADELE:  It sounds that way.

20          MS. VIE:  No.  I asked and you just -- I know you're

21          trying to protect him, counsel.  That's fine.  That's your

22          job.  It's okay.  At this time I want to get 1 admitted;

23          any objection?

24          MS. ADELE:  I have none.  Actually I do.  The record

25          speaks for itself.  It clearly refers to a handbook --
```

| | |
|---|---|
| 1 | part of the employee handbook -- and it does refer to |
| 2 | employees.  So that is my objection as to that particular |
| 3 | document. |
| 4 | MS. VIE:  P-1.  Your objection is noted. |
| 5 | MS. ADELE:  Thank you. |
| 6 | (Whereupon, Exhibit No. P-1 was marked for purposes |
| 7 | of identification.) |
| 8 | MS. VIE:  For the record, he also said that if a partner |
| 9 | did it it would not be -- |
| 10 | MS. ADELE:  He did not say a partner.  He said anyone |
| 11 | else. |
| 12 | MS. VIE:  Anyone else? |
| 13 | MS. ADELE:  The record will speak for itself. |
| 14 | MS. VIE:  Are you getting angry counsel? |
| 15 | MS. ADELE:  Are you kidding?  I beg your pardon.  Don't |
| 16 | presume to know what I am feeling, Ms. Vie. |
| 17 | MS. VIE:  I'm not.  I asked you -- |
| 18 | MS. ADELE:  I'm sorry, did I say Vie or Vee?  I beg your |
| 19 | pardon.  Is it Vee? |
| 20 | MS. VIE:  I said I'm just asking. |
| 21 | MS. ADELE:  I'm just telling you. That's not -- |
| 22 | MS. VIE:  If you're not, you're not.  I'm not speculating. |
| 23 | MS. ADELE:  I'm telling you.  I'm just telling you. |
| 24 | MS. VIE:  I'm not speculating. |
| 25 | MS. ADELE:  Okay.  Don't. |

BY MS. VIE:

Q    Okay.  Now, has Mount Vernon Medicine committed any fraud; any type?

A    No.

Q    You testifying under oath here today your answer is that it has not?

A    Absolutely not.  We have not ever knowingly committed any fraud.

Q    Knowingly is such an attorney's word.

A    Is it?

Q    It really is.  I like that.  I like that.  So it could have, but maybe not knowingly; is that your testimony?

MS. ADELE:  Objection; asked and answered.

THE WITNESS:  Our policy and our practice has always been to be ethical and do what's best for our patients, never to do anything that wasn't in the best interest of our patients, and honest -- you know, doing things in an honest manner to the best of our knowledge of whatever rules -- and whatever the current rules and policies are in existence.

BY MS. VIE:

Q    Okay.  Has Mount Vernon Medicine committed Medicare or Medicaid fraud?

A    No.

Q    Are you currently under any investigation for

1    Medicare or Medicaid fraud?

2        A    No.

3        Q    Are any physicians in the practice commonly named

4    Mount Vernon or under the new assumed name under any

5    investigation for Medicare fraud?

6        A    Not to my knowledge.

7        Q    Why do you say not to your knowledge when you are

8    affirmatively saying no all the other times?

9        A    I know I'm not.  I haven't heard of anybody else

10   being under investigation.

11       Q    How long has Linda Bower been working for the

12   practice?

13       A    Three years, roughly; give or take.

14       Q    How many raises has she received?

15       A    I'm not sure.  A couple?  I could be wrong.

16       Q    A couple being two to four?  Two?  Three?

17       A    Two.  A couple would be two.

18       Q    Who did her evaluation?

19       A    The partners.

20       Q    Did you vote that she get a raise?

21       A    We all agreed on the raise.  We discussed the amount

22   of the raise for all employees.  That was all run by us.

23       Q    All the partners agreed?

24       A    Yeah.  We would discuss it and come to a consensus.

25       Q    When was the last raise she received?

1       A       I think the last anniversary of her employment.  I'm

2    not sure what month that was or what date that was.

3       Q       Has she received a raise after February the 17th,

4    2011?

5       A       Yes.

6       Q       Has she received a raise after February 17th, 2012?

7       A       I'm not sure when her next anniversary was, so I'm

8    not sure.  She may have.

9       Q       Does February 17th, 2012, have any significance for

10   you?

11      MS. ADELE:  Did you say February 12th?

12   BY MS. VIE:

13      Q       February 17th.  Does it have any significance for

14   you?  I could have.  Thank you, counselor.

15      A       I think that was the date -- February 17th, 2012 --

16   that was the date that Ms. Rembert and Ms. Bower had a

17   discussion about Ms. Rembert's use of Facebook, and there was

18   some disagreement.

19      Q       So you haven't heard on that date that Ms. Bower hit

20   her?

21      MS. ADELE:  Objection to the form.

22      THE WITNESS:  I was told that --

23   BY MS. VIE:

24      Q       So the answer to my question is yes, you have heard?

25      A       I have heard that Mrs. Bower, after many attempts to

1    get Ms. Rembert off of Facebook, in a maternal way took a few

2    papers and tapped her on the hand and said, "What are you

3    doing?"

4         Q    In a maternal way tapped her on her hand with what?

5         A    I wasn't there, but I was told it was, like, a small

6    bunch of papers -- maybe 10 or 12 papers -- and went like this

7    (indicating) and just said, "What are you doing?"

8         Q    And tapped her on her hand?

9         A    Tapped her on her hand; or tapped her.  I don't know

10   where.

11        Q    Okay.  Give me a second.  Am I quoting you when I say

12   "maternal way"?

13        MS. ADELE:  You heard him counselor.

14        THE WITNESS:  Maternal.

15   BY MS. VIE:

16        Q    Okay.  About ten papers?

17        A    I was told it was a small grouping of papers.

18        Q    Who told you this?

19        A    I don't remember who initially told me about it.  I

20   was at my station seeing patients, but I was told it was -- I

21   think I heard it from a few people, one of whom was Mrs. Bower.

22        Q    Who would be the few people?

23        A    One would be Mrs. Bower.

24        Q    Okay.

25        A    There were a few other people up front that mentioned

1   they saw what happened, but I don't remember the details or

2   exactly who else told me. I heard from a few people.

3       Q    Okay. Can you take a moment to think about that?

4   You used the word "maternal" and "on her hand with ten papers,"

5   but you don't know who you got the information from?

6       A    I don't remember. You understand that I heard about

7   the incident after it happened? I wasn't there.

8       Q    Usually that's how it happens; that something happens

9   and you're told. Yes, I do understand. Did you not know the

10  police came to your practice?

11      A    The police were already gone by the time I heard

12  about it.

13      Q    So you did know that the police came?

14      A    I heard that the police came and then they spoke to

15  both parties and then they left.

16      Q    Who did you hear this from?

17      A    I heard it from Mrs. Bower. I probably heard it from

18  most of the people at the front desk. I asked what happened.

19  I said what was -- you know, they told me something happened so

20  I asked what happened.

21      Q    Did it cause you any concern that the police would

22  come to your premises or place of business?

23      A    Yes.

24      Q    Did you believe the story or the recount of the

25  events that Ms. Bower, in a maternal way, took ten papers and

                                                        32

1  hit her on the hand that the police would have to be called.
2  Did you believe that story?
3      A    I knew that Ms. Rembert had been --
4      Q    Could you answer the question first, and you can
5  explain --
6      MS. ADELE:  He's trying to answer the question.  Allow him
7      to answer the question.
8  BY MS. VIE:
9      Q    The question is a yes or no, and you most definitely
10  can explain.  The question is:  Did you find that odd; that the
11  police would come with the story that you had heard; yes or no?
12     A    No.
13     Q    You didn't find that odd?  Okay.
14     MS. ADELE:  Can he explain it?
15     THE WITNESS:  My -- I knew that Mrs. Bower had had
16     multiple discussions with Ms. Rembert over the course of
17     months concerning her use of Facebook, and had admonished
18     her to please stop, because we have an office policy
19     that's been extant since 2009 that employees were not to
20     use Facebook, especially during working hours.
21  BY MS. VIE:
22     Q    And if they did, they could be hit for it?
23     A    No.
24     MS. ADELE:  Objection to the form.
25     THE WITNESS:  No, of course not.

33

1   BY MS. VIE:

2       Q    So, because she was using Facebook, let's just be

3   clear --

4       A    Well, I'm just going to finish what I was trying to

5   say to you.

6       Q    Okay.  Go ahead.  Go with the speech.

7       A    It's not a speech.  I'm trying to shed some light on

8   this.

9       Q    Okay.  Well, you have to be responsive to the

10  question.

11      A    I understand.

12      MS. ADELE:  He's trying to respond and you keep

13          interrupting him.  Let him explain.

14  BY MS. VIE:

15      Q    And you can explain, so -- okay.  Well, maybe I'm not

16  understanding, because your explanation says -- to me you

17  said -- that you weren't concerned.  But, if we had all of this

18  going on with Facebook and the police were called, it seems to

19  me you would've thought that was odd.  So, yes; do explain for

20  me.

21      A    I'll explain it, and maybe that'll make it more

22  clear.  I knew that this was something that Mrs. Bower had

23  discussed with Ms. Rembert in the past.  I know that Mrs. Bower

24  had kind of a motherly feeling towards Ms. Rembert, because

25  when Mrs. Bower was employed we had already -- we were ready to

1    let Ms. Rembert go based on our former office manager Donna
2    Steggs' recommendation.  She was an employment expert.
3         Q    How long had she been working there?
4         A    Ms. Rembert?
5         Q    No, Ms. Steggs.
6         A    Ms. Steggs worked for a couple years before
7    Mrs. Bower.
8         Q    Okay.
9         A    Subsequently, I went to --
10        Q    Let me ask you some questions.  You're giving me a
11   lot of stuff.
12        A    Well, let me -- can I just finish that?
13        Q    No, not right now.  Let me -- let me take a second.
14   You can definitely answer, but let me take a second.
15        MS. ADELE:  So you'll give him a chance to explain the
16        answer he hasn't gotten around to?
17        MS. VIE:  So you can either make an objection or not.
18        MS. ADELE:  I'm making my objection on the record that she
19        hasn't given my client the opportunity to explain her
20        initial question.  Now we're going to another question.
21        Go ahead.
22   BY MS. VIE:
23        Q    So, now, my question is:  How long had Mrs. Bower
24   been the office manager prior to Tanesha being terminated?
25        A    Two years, a year and a half, something like that;

1    probably a year and a half.

2        Q    So, now, she felt motherly?

3        A    Well, what happened was Donna Steggs felt that

4    Tanesha's skill level and her work performance wasn't

5    tantamount to continued employment.  When Mrs. Bower came on, I

6    said to her, "Are we going to let Tanesha go?"  She said, "I

7    want to give her a fair chance to do well."  And many, many

8    times when we had partner meetings, we discussed Ms. Rembert's

9    performance, and we always felt it was suboptimal.  But Linda

10   Bower continued to say, "Let's --

11       Q    I'm going to have to interrupt you.  I'm giving you

12   such -- my question was --

13       A    Well, but --

14       Q    Now, wait, wait, wait, now.  Because you can't just

15   make the speech.  I'm going to let you do it because it's --

16   the more the better; okay?

17       A    Mm-hmm.

18       Q    In your case it should be less.  But, in any event,

19   my question to you was:  Why did you not see that it was odd

20   for the police to come if she hit her on the hand?  And you're

21   giving me something that has nothing to do with that.  So, I

22   want you to be able to explain your answer, but it has to at

23   least be germane to the question remotely.

24       A    I understand.

25       Q    Okay.

                                                              36

1    A    I felt that Mrs. Bower had a maternal feeling towards
2    Tanesha -- Ms. Rembert.  She had been in her court from the
3    beginning.  I think she was disappointed in her use of
4    Facebook, and I think she was saying, "I told you, don't do
5    this.  What're you thinking?" like she would with a daughter.
6    And that's why I said maternal.
7    Q    Okay.
8    A    And I honestly believe that.
9    Q    And that's why you weren't -- didn't think that the
10   police coming was a problem?
11   A    No, I felt that Tanesha's feelings were -- I thought
12   her feelings were hurt.  She was upset and she called the
13   police.  She didn't want to be scolded.
14   Q    Well, she wasn't exactly scolded, was she?  Wasn't
15   she thrown off the premises?
16        MS. ADELE:  Objection; that is mischaracterizes the
17        evidence in the record.
18        THE WITNESS:  Not to my knowledge.  I think she was told
19        to -- if she was, told she could go home and cool off for
20        a day.
21   BY MS. VIE:
22   Q    Would you be surprised if the facts revealed that, in
23   fact, Ms. Rembert was not even touched on her hand, but on her
24   back?
25   A    Well, I didn't have the -- I didn't have --

1    Q    The question is --

2    A    Okay.

3    MS. ADELE:  He's trying to answer.  Let him speak.

4    MS. VIE:  No, he's not.

5    MS. ADELE:  He is trying to answer.

6    BY MS. VIE:

7    Q    The question is:  Would you be surprised -- and you

8    can say yes or no and go on with the litany --

9    A    No.

10    Q    You would not be surprised?

11    A    No.  I would not be surprised because I wasn't sure

12    where she was -- where the contact was made.  I was just

13    guessing it was her hand.  I wasn't sure.

14    Q    Okay.  So now I'm really confused.  Testimony you

15    gave is:  He heard from Mrs. Bower that she hit her, in a

16    maternal way, with a stack of ten papers and hit her on the

17    hand.  And now you're not sure?

18    A    I thought it was --

19    MS. ADELE:  Objection.  I think he said on the record, the

20    record will speak for itself, saying that he heard from

21    Mrs. Bowers and other employees.

22    MS. VIE:  You can make an objection.  You can't testify.

23    You can't just say --

24    MS. ADELE:  I am clarifying what is on the record because

25    you are mischaracterizing the record.  The record will

1    speak for itself. He said Mrs. Bower and other employees.

2        MS. VIE: So you're objecting?

3        MS. ADELE: My objection is for the record.

4    BY MS. VIE:

5        Q    Okay. So go ahead.

6        A    I'm just -- having not been there, I'm just trying to

7    remember the best I can.

8        Q    So why tell me she hit her on the hand?

9        A    I thought it was her hand because she saw her phone,

10   so she may have touched her on the hand. It could -- I don't

11   know exactly what part of her body was touched.

12       Q    Do you even know that it was in a maternal way, now?

13       A    Oh, I think it was.

14       Q    Okay.

15       A    I think that Mrs. Bower thought of Tanesha as she

16   would --

17       Q    Aren't you speculating right now, though?

18       A    No, I remember her, Mrs. Bower, many times in tears,

19   saying she wanted Tanesha to get a bigger raise; that she cared

20   about Tanesha; that Tanesha -- she wanted Tanesha -- it's hard

21   to make it on today's incomes and she wants, you know, wanted

22   Tanesha to get as big a possible raise as possible. She was

23   always in her court.

24       Q    Well, why didn't she get any?

25       MS. ADELE: Get what?

1    THE WITNESS:  My understanding is Tanesha did get a raise

2    during the time that Mrs. Bower was with us.

3    BY MS. VIE:

4    Q    Okay.  Did she get --

5    A    Or she got --

6    Q    I'm sorry.  Go ahead.

7    A    She either got a raise or she got some kind of

8    end-of-year bonus, but she got some kind of --

9    Q    Didn't everybody get end-of-the year bonuses?

10   A    Different bonuses, different people; but my

11   understanding -- I know that Mrs. Bower did push for Tanesha to

12   be rewarded in a monetary fashion.

13   Q    It's funny you know that, but you don't know any of

14   the details of the incident.  So why would we --

15   MS. ADELE:  Objection.  He wasn't there.  Can we move on?

16   THE WITNESS:  I'm talking about the partners meetings when

17   we are all there --

18   MS. VIE:  Let him finish.

19   THE WITNESS:  -- we would have the partners meetings and

20   we would discuss all the employees and what their

21   performance was.  And Mrs. Bower would ardently advocate

22   for Ms. Rembert to get financial rewards, and sometimes

23   tearfully so.

24   BY MS. VIE:

25   Q    Now testifying that you didn't know where she was

1    hit, did you think as a partner you should get to the bottom of
2    it?

3          MS. ADELE:  Objection.
4          THE WITNESS:  I think that at that point I wasn't doing
5          the personnel stuff for the group.  My partners and I
6          discussed it briefly.  I kind of -- they were more
7          involved in it than I was.
8    BY MS. VIE:

9          Q    Okay.  So you did talk to your partners about it.
10   You told me you didn't remember, but you did talk to the
11   partners?

12         A    I spoke to my partners.

13         Q    So the partners was aware of this?

14         A    They were.  I spoke to my partners, Drs. Tinanoff and
15   Cohn, and we all agreed that the behavior then exhibited was
16   not appropriate.  We all -- we all -- we recommended that any
17   future disciplinary actions toward staff be -- the partners be
18   involved and Linda not be -- do this by herself, and we
19   recommended Linda attend a anger management class.

20         Q    Well, if you already had a policy --

21              (Whereupon, the attorney presented a document to the
22         witness.)

23              (Whereupon, the witness viewed the exhibit.)

24         A    And that that was consistent with our policy that --
25         MS. ADELE:  Let her ask you the question.

                                                              41

1     MS. VIE: Let him go on. I mean, he's making speeches.
2     THE WITNESS: Go ahead.

3     MS. ADELE: Ask your question.

4  BY MS. VIE:

5     Q    "The company will not tolerate workplace violence."
6  That is in the policy. For the record, "Mount Vernon Internal
7  Medicine" is the heading. It's marked as Exhibit 2,
8  "EMPLOYMENT POLICIES AND PRACTICES." "Mount Vernon Internal
9  Medicine, LLP is committed to providing a safe and secure
10 working environment. The company will not tolerate workplace
11 violence. Any employee who commits an act of violence at work
12 against a person or property will face disciplinary action up
13 to and including discharge." I'm going to give you time.
14 Hitting someone is violence. We would agree to that; right?
15 Accidental or not?

16    A    I would agree that -- there's degrees of violence.
17 But I agree that what Linda Bower did was not appropriate, and
18 we --

19    Q    My question is --

20    MS. ADELE: He's answering. Let him finish. You keep
21    interrupting.

22 BY MS. VIE:

23    Q    The question is: Physical hitting of someone is a
24 crime, too, but all I'm asking you is if you would just say it
25 is violence?

```
1       MS. ADELE:  I'm going to object for the record.

2       MS. VIE:  I know your objection --

3       MS. ADELE:  Now you've asked, let me -- I'm going to

4       object for the record.  Ms. Vie is not giving my client

5       the opportunity to explain his answers.  We are not in a

6       courtroom that requires a yes or no answer.  She ought to

7       give him the chance to explain his answers.  It may not be

8       acceptable to her, but she needs to let him speak and then

9       she can ask her questions.  She is not giving him the

10      opportunity to answer the question.  That is my objection.

11      THE WITNESS:  I think in the case where Mrs. Bower --

12      MS. VIE:  That's not my question.

13      MS. ADELE:  Let her ask you again the question.

14      THE WITNESS:  Okay.

15      MS. VIE:  This is going to take longer.  You have to

16      answer the question.

17      MS. ADELE:  Go ahead and ask the question so he can

18      understand it, and give him the chance to speak.

19   BY MS. VIE:

20      Q    So the question is:  Hitting someone is violence,

21   isn't it?  And you can comment on the degrees if you like.

22   Isn't it?  So your answer to isn't hitting someone is violence?

23      A    It is.

24      Q    Do you have anything now you want to explain about

25   it?
```

43

1    A    Well, I think sometimes it's more -- what Mrs. Bower

2   probably intended was more an admonishment than trying to hurt

3   Ms. Rembert. I don't think she was trying to hurt her at all.

4   I think she was just surprised.

5        Q    How do you know if you weren't there and you didn't

6   see it and you don't know where it was? How can you really say

7   that?

8        MS. ADELE: Objection.

9        MS. VIE: I'm not finished with the question.

10       MS. ADELE: You're badgering my witness -- my client. You

11       are -- I feel you are badgering this client.

12       MS. VIE: That's because you just have this thing for me.

13       MS. ADELE: Because you keep on -- I don't have any thing

14       with you, Ms. Vie. Allow this gentleman to answer your

15       question.

16       MS. VIE: You're the one that's kept cutting him off.

17       MS. ADELE: I'm not. Because you keep hollering. Allow

18       this gentleman, I mean, come on. Out of courtesy, allow

19       him to speak. You keep, I mean -- just let him speak.

20   BY MS. VIE:

21       Q    You were speaking.

22       A    I think Mrs. Bower really cared about Ms. Rembert,

23   and I think she was frustrated, like any parent would be. I

24   mean, because she could have easily been her parent. I mean,

25   she's much older. I mean, any parent would be if you're

44

1　frustrated with that child or a younger person. You're trying

2　to give them advice, you're trying to get them to do well --

3　　　Q　And the police came to your office, and she was that

4　upset, and you still say it was just as a parent?

5　　　MS. ADELE: Objection.

6　　　THE WITNESS: Well, I'm not sure why the police were

7　　　called. I wasn't there.

8　BY MS. VIE:

9　　　Q　And you didn't investigate that?

10　　　A　We -- we did. As partners we spoke to Mrs. Bower.

11　We told her that we didn't feel that any communication in that

12　way was productive. We asked her to take an anger management

13　course, and we told her that she couldn't discipline employees

14　in the future without us there.

15　　　Q　Did you speak with Ms. Rembert to get her side of the

16　story? That it might not have been a maternal touching on that

17　end?

18　　　A　My partner did.

19　　　Q　Which one?

20　　　A　I think Dr. Cohn did. He was head of personnel at

21　that time.

22　　　MS. VIE: This will be P-2 that I'm putting in. P-2 to be

23　　　admitted, please.

24　　　　　(Whereupon, Exhibit No. P-2 was marked for purposes

25　　　of identification.)

BY MS. VIE:

Q    Why did you not fire Linda after she hit Tanesha
Rembert?

A    She was given a warning.  We didn't feel that her
intention was to hurt Mrs. Rembert.  It was more to correct her
behavior, so we tried to reeducate Mrs. Bower.

Q    Do you have a policy that says it's okay to use
violence to correct an employee?

A    No.

        (Whereupon, the attorney presented a document to the
    witness.)

        (Whereupon, the witness viewed the exhibit.)

Q    You would admit that that was unsatisfactory conduct,
would you not?

A    Yes.

    MS. VIE:  P-3.  You have any objection to 3?

    MS. ADELE:  Just for the record, the question "you would
    admit that that was unsatisfactory conduct," just -- can
    you clarify what you were referring to?  Are you talking
    about Ms. Bower's conduct being unsatisfactory?

    MS. VIE:  He understood the question, counsel.

    MS. ADELE:  I just wanted to make sure we are clear for
    the record.

        (Whereupon, Exhibit No. P-3 was marked for purposes
    of identification.)

1    BY MS. VIE:

2         Q    Did you understand that I was talking about her

3    hitting Tanesha?  That you would admit that that was

4    unsatisfactory conduct?

5         A    Yeah, I would admit that it was unsatisfactory, and

6    the partners did not support that behavior.

7         Q    But you did not fire her at the time, either, did

8    you?

9         A    No, but we gave her a warning.

10        Q    The question at first is, and you get to explain:

11   You did not fire her at that time?

12        A    I answered no.

13        Q    Okay.

14        A    But we did warn her, counsel her, limit her

15   authority, and get her to go to an anger management course.

16        Q    So is it your testimony that Mahogany Thomas made a

17   mistake, and she was hit on accident because she was arguing?

18        A    No, I didn't hit Ms. Thomas.

19        Q    I said she was hit.  I didn't say you hit her.  Do

20   you want me to ask you that question again?

21        A    Absolutely it was an accident.

22        Q    Okay.

23        A    I felt terrible about it.

24        Q    After she made a mistake?

25        A    It was after she was having an argument with

47

1 | Mrs. Roberts about the measurement of a patient's neck.

2 |     Q    Okay.

3 |     A    I can tell you --

4 |     Q    How many writeups did Ms. Thomas receive prior to the

5 | shelf hitting her?

6 |     A    I have absolutely no idea.

7 |     Q    How many writeups after?

8 |     A    No idea.

9 |     Q    How did you prepare for this deposition?

10 |     MS. ADELE:  Are you asking if he met with me or if he

11 |     looked at documents or --

12 | BY MS. VIE:

13 |     Q    I'm asking him:  How did you prepare for this

14 | deposition?  I have no idea how you did it.  I'm just asking

15 | you how you did it.

16 |     A    I met with my attorney.

17 |     Q    What else did you do?

18 |     A    That's it.

19 |     Q    Did you have an occasion to talk to any other

20 | partners about your deposition today?

21 |     A    No.  Other than they knew I was going in for a

22 | deposition, but nothing more than that.

23 |     Q    Do you think that your employees -- do you have an

24 | opinion as to what your employees think about the incidents

25 | that happened between Mahogany Thomas and Tanesha Rembert?

1    MS. ADELE:  Objection to the form.

2    THE WITNESS:  I don't know what they think.  I know that

3    my employees -- most of my employees come to me for care.

4    Most of my employees know that I care about them.  Most of

5    my employees know that I have integrity and see everybody

6    as the same.  They also know that I'm very passionate

7    about patient care, and I'm deathly afraid of any mistakes

8    made with patient care because, having worked as a

9    hospital critical care physician, I've seen little

10   mistakes have major consequences.

11       Q    Would you be surprised if your employees think that

12   you're a loose cannon?

13       MS. ADELE:  Objection to the form.

14   BY MS. VIE:

15       Q    Would you be surprised?  What kind of form?  Would

16   you be surprised?

17       MS. ADELE:  What does loose cannon mean?  Objection to the

18       form.

19   BY MS. VIE:

20       Q    What do you think a loose cannon means?

21       A    It can mean different things in different contexts,

22   but mostly it means someone that is unpredictable.

23       Q    Would you be surprised if your employees thought that

24   you had anger issues and could explode at any time?

25       MS. ADELE:  Objection to the form.

1    BY MS. VIE:

2        Q    Would you be surprised if your employees thought you

3    had anger issues?

4        A    I -- would I be surprised?

5        Q    The question is:  Would you be surprised?  It's not

6    that hard.  Would you be surprised?

7        A    To some extent, yes.

8        Q    Would you be surprised if they indicated that you

9    have angry tirades in the office?

10        MS. ADELE:  Objection; asked and answered.

11        THE WITNESS:  Yes.

12    BY MS. VIE:

13        Q    How many times have you witnessed Linda Bower raising

14    her voice toward the employees in the office?

15        A    I don't remember her raising her voice.  Usually her

16    interactions would be inside her office with the door closed.

17        Q    So you remember her taking them into the office and

18    raising her voice at them?

19        A    No, I didn't say raising her voice.  I wasn't there.

20    When she'd have a meeting with an employee, I wasn't there.

21    The only time I ever met with employees would be sometimes when

22    employees were not getting along with each other.  I would call

23    them into my office and say, "Let's all get along," and, "We

24    all work for a common goal."

25        Q    What do you mean you're not there?  It's not during

1    business hours?

2         A    No.  But her office is on one side of a fairly large

3    9000-square-foot suite.  I'm way down on the other end.  I'm

4    busy and I'm seeing patients.  I'm not sitting in the office

5    with her when she's doing her job.

6         Q    Okay.  Has anyone ever complained to you that she was

7    hollering at them and fussing at them?

8         A    No.

9         Q    No patients have ever told you that they witnessed

10   her berating anybody at the front desk?

11        A    No; never heard that.

12        Q    Did you read the documents that she provided to the

13   EEOC in reference?

14        A    No.

15        Q    Okay.  Explain to me how this works.  You don't see

16   anything.  You're not hearing anything.  How do you all meet

17   and come up with raises if you don't know what's going on on

18   the floor?

19        A    We had partner meetings every few months, and we'd

20   all get together.  And just -- because, when you see patients,

21   you get to know who's doing a good job and who's not because of

22   all the -- it's kind of teamwork.  And I would listen to what

23   my partners said.  My partners tended to interact more in the

24   front with employees than I do.  I tend to stay in the back

25   more because I'm a little bit busier.  And we all bounce ideas

1  by each other, we all listen to each other, and we come up with

2  what we feel is fair.

3      Q    It's not because the employees are afraid of you, is

4  it?

5      A    I don't understand what you're asking me.

6      Q    It's not that you have less interaction because

7  they're afraid of you?

8      A    No.  If employees are afraid of me, why would so many

9  of them come to me for help?

10     Q    You can't ask me questions, sir.

11     A    Oh, okay.

12     MS. ADELE:  He was trying to answer.

13     THE WITNESS:  So, the answer would be no.  I don't think

14         that they're afraid of me.

15  BY MS. VIE:

16     Q    She's clairvoyant.  She knew what you were saying.

17  Was that speculative, at all?

18     A    I don't feel my employees are afraid of me.  I try

19  to -- I'm pretty passionate about patient care, and I think

20  that they know that I'm out -- I'm a fair person and I'm out

21  for the, you know, good of the practice.

22     Q    So you would be surprised if they thought that?

23     A    Thought what?

24     Q    You would be surprised to know that they thought they

25  were a little afraid of you?

52

1    A    Yeah.  Yes.  I certainly don't want them to be afraid
2    of me.

3    Q    To your knowledge, why was Tanesha fired?

4    A    To my knowledge, Tanesha was fired because, over the
5    course of a couple years, after multiple meetings, starting
6    with Donna Steggs recommending her termination, her performance
7    had deteriorated.

8    Q    So are you saying she was fired for her performance?

9    A    Yes.  The plan was to terminate her before Mrs. Bower
10   came on.  There was ongoing problems with charts being
11   misfiled, unintelligible messages passed back --

12   Q    Are you still explaining your answer?

13   A    Yes.

14   Q    Or are you just telling me stuff?

15   A    I'm explain my answer.

16   Q    Okay.  Just want to be sure.

17        MS. ADELE:  Have you finished your answer?

18   BY MS. VIE:

19   Q    To your knowledge, why was Linda Bower fired?

20   A    Linda Bower was not fired.

21   Q    Why did she leave the practice?

22   A    For a better opportunity.

23   Q    I want to remind you you are under oath.

24   A    I understand.  She was looking for -- she resigned.

25   Q    Okay.  Isn't it true she resigned because you wanted

53

1  her pay the legal fees of this big mess she caused? Let's just

2  cut to the chase; isn't that why?

3      MS. ADELE: Objection to the form.

4      THE WITNESS: No, that's not why she resigned; not to my

5         knowledge.

6  BY MS. VIE:

7      Q   So you and your partners didn't get in a room and

8  discuss this one?

9      A   No.  No we did not.

10     Q   Employees are allowed to receive occasional phone

11  calls according to policy; isn't that correct?

12     A   Oh, I don't know what the exact policy is as far as

13  phone calls go.  But, I mean, certainly, if someone has a phone

14  call coming in and it's pertinent to their family's health and

15  stuff like that, of course we allow that.

16         (Whereupon, the attorney presented a document to the

17      witness.)

18         (Whereupon, the witness viewed the exhibit.)

19     Q   Are you aware that, with the new phones, that if

20  someone gets a call -- let's say you get a call from Valerie,

21  and her number's in your phone and she calls, it lights up.  Do

22  you know that that happens?

23     A   Mm-hmm.

24     MS. VIE:  I'm going to enter this.  Put that in for the

25      record.

```
1              (Whereupon, Exhibit No. P-4 was marked for purposes
2         of identification.)
3         MS. VIE:  Any objection, counsel?
4         MS. ADELE:  No.
5         THE WITNESS:  All right.  But I also, to finish that
6         answer, I also know that --
7         MS. VIE:  I'm objecting as being nonresponsive.
8         THE WITNESS:  I also am aware --
9         MS. ADELE:  Don't worry about it.
10        THE WITNESS:  Okay.
11   BY MS. VIE:
12        Q    Who was your immediate supervisor at Gwinnett Medical
13   Center?
14        A    At Gwinnett Medical Center?  Greg Miller and Marty
15   Austin were the doctors that were my supervisors.
16        Q    Greg Miller and?
17        A    Martin Austin.
18        Q    If I contacted them, what would be their reason that
19   you left the practice; or the Medical Center?
20        A    I wanted to move into a private practice.
21        Q    Is that what Greg would say?
22        MS. ADELE:  Objection to the form; cannot speculate as to
23        what Mr. Greg would say.  He's already asked and answered
24        the question.
25   BY MS. VIE:
```

```
1        Q    What do you think Greg would say?

2        MS. ADELE:  Same objection.

3   BY MS. VIE:

4        Q    You have to answer.

5        A    That I took good care of my patients and that --

6        Q    I wasn't clear.  What would Greg say?  What do you

7   think Greg would say was your reason for leaving?

8        A    That I took good care of my patients and I --

9        Q    You're not listening.

10       MS. ADELE:  He's trying to answer the question.  Let him

11       finish.

12       THE WITNESS:  I'm trying to finish.

13       Q    That's not the question.  I'm not going to just keep

14  letting you do it.  I know she's going to do that the whole

15  time.  My question is:  What do you think Greg Miller would say

16  on why you left Gwinnett Medical Center?

17       MS. ADELE:  Same objection.

18       MS. VIE:  Okay.

19       MS. ADELE:  My client needs to be given the opportunity to

20       properly respond to the answer, and counsel is not

21       allowing him to do so.

22       MS. VIE:  Counsel, you can't remotely think that because

23       that he says --

24       MS. ADELE:  I will state -- do not presume to state what I

25       think, Ms. Vie.  Let him respond.  I can state my
```

```
 1       objection --
 2       MS. VIE:  Look, he can't make up --
 3       MS. ADELE:  Allow me to finish my objection for the
 4       record.  Again -- I know.  Beg your pardon.
 5       MS. VIE:  She made her objection.  She can make her
 6       objection.  I don't have a problem with that.
 7       MS. ADELE:  Let me finish my objection.  Don't tell me how
 8       to make my objection.  Again, same objection; she is not
 9       giving him, my client, the opportunity to speak, to
10       respond to her question.
11  BY MS. VIE:
12       Q    Let me make it real simple for you.  Here's the
13  question:  Leaving Gwinnett Medical Center, what do you think
14  Greg Miller would say about you leaving Gwinnett Medical
15  Center?
16       MS. ADELE:  Same objection to the form.
17       THE WITNESS:  That I was ready to pursue private practice.
18  BY MS. VIE:
19       Q    What do you think Martin would say --
20       MS. ADELE:  Same objection; calls for speculation.
21       Objection to the form.
22  BY MS. VIE:
23       Q    -- Martin would say about you leaving the practice?
24       A    That I wanted to go into private practice.
25       Q    I'm not sure if I asked you this.  If I did, I
```

1    apologize.  How long did Mahogany Thomas work for you after the

2    incident with the shelf that you hit that slid down and hit her

3    leg?

4         A    Several months.

5         Q    Several being more than four?

6         A    About three, I believe.

7         Q    I think I missed this, too.  Why was she terminated?

8         MS. ADELE:  Objection to the form; asked and answered.

9    BY MS. VIE:

10        Q    Why was Mahogany Thomas terminated?

11        A    She was let go.

12        Q    Why?

13        A    No more work.

14        Q    I do remember that.  I apologize.  Well, I need a

15   break counsel.  I'm going to take a break for a few minutes.

16   (Whereupon, a recess of approximately 10 minutes was taken.)

17        MS. VIE:  I think I'm going to stop there.

18        MS. ADELE:  As in done?

19        MS. VIE:  I think I'm done.

20             (Whereupon, proceedings concluded at 3:35 p.m.)

21

22

23

24

25

ERRATA SHEET

I have read the within and foregoing 58 pages and no changes are required.

This, the _____ day of _____, 2013

_____

I have read the within and foregoing 58 pages and the following changes are required:

Page _____ Line _____: _____

Reason: _____

Page _____ Line _____: _____

Reason: _____

Page _____ Line _____: _____

Reason: _____

Page _____ Line _____: _____

Reason: _____

This, the _____ day of _____, 2013

_____

Sworn to and subscribed before me

this _____ day of _____, 2013.

_____

Notary Public, Georgia

DISCLOSURE

STATE OF GEORGIA

COUNTY OF FAYETTE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Certified Court Reporter and an independent contractor.

I was contacted to provide court reporting services for this deposition. I will not be taking this deposition under any contract that is prohibited by the O.C.G.A 15-14-37(a) and (b). I have no contract/agreement to provide court reporting services with any party to the case, any counsel in the case.

I am not disqualified for interest, personal or financial, under O.C.G.A. 9-11-28(c).

I will charge my usual and customary rates to all parties in the case.


This the 18th day of APRIL, 2013.


Bruce Niedermeyer

Certificate No. 2828

CERTIFICATE

STATE OF GEORGIA

COUNTY OF FAYETTE

I, Bruce Niedermeyer, Certified Court Reporter, certify that the foregoing transcript is a true, correct and complete record of the testimony given by the deponent, JEFFREY P. POLEKOFF, who was first duly sworn in by VALERIE VIE; that I am not a relative, employee, attorney or counsel of any of the parties; nor financially interested in the action; that the said deponent and counsel in the presence of each other and before me DID NOT waive the reading and signing of the deposition; and the original deposition under seal shall be filed with the Court by the attorney taking the deposition.

This certificate is expressly withdrawn and denied upon disassembly and/or photocopying of the foregoing transcript, or any portion thereof, unless such disassembly or photocopying is done by the undersigned Certified Court Reporter and original signature and official seal is attached hereto.

WITNESS my hand and seal at Fayetteville, Fayette County, Georgia, this the 7th day of MAY, 2013.

Bruce Niedermeyer, Certified Court Reporter

Certificate No. 2828

406    SUMMARY DISMISSAL

There are certain actions which will result in summary dismissal, that is **dismissal without notice or severance pay.**

1.    ABUSIVE TREATMENT OF PATIENTS.  Inappropriate physical contact with patient, abusive language directed toward a patient, or actions/words which could be interpreted by the patient as threatening will result in immediate termination.

2.    VERBAL OR WRITTEN BREACH OF PATIENT CONFIDENTIALITY.
Strict confidentiality is required for all patient information to which your job provides access, including information of a personal rather than a medical nature. See the policy on confidentiality.  Such information is not to be released in verbal or written form to <u>anyone</u> including members of the patient's family or any other third party other than a practice employee who needs to know in order to perform her job.

To release information to third party payors at the request of the patient, <u>you must have a written release signed by the patient.</u>

Information about doctors, other employees, their families, finances or other private matters, should be released only when other persons can substantiate a need to know this information.

3.    EMBEZZLEMENT OF PRACTICE FUNDS, EQUIPMENT OR SUPPLIES.
Careless handling or theft for sale or use of practice funds, equipment or supplies, including sample drugs taken without permission of the doctors in this practice, will result in dismissal.

4.    FORGERY OF DOCUMENTS.    Discovery of forgery of documents by an employee will result in summary dismissal.

5.    ILLEGAL USE OF CONTROLLED DRUGS.   If it is discovered and proven that an employee is using controlled substances or has obtained controlled drugs from this office illegally for use or sale, the employee will be summarily dismissed.

6.    ALCOHOL/DRUG INTOXICATION.  It is not possible to function properly in the setting of our office when under the influence of alcohol or drugs.  Upon evidence of such condition, the employee will be counseled by the Office Manager

8/95



EXHIBIT

REMBERT-0078

# MOUNT VERNON INTERNAL MEDICINE

## EMPLOYMENT POLICIES AND PRACTICES

### Workplace Violence

Mount Vernon Internal Medicine, LLP is committed to providing a safe and secure working environment. The company will not tolerate workplace violence. Any employee who commits an act of violence at work against a person or property will face disciplinary action up to and including discharge. If circumstances warrant, the matter will be referred to legal authorities for prosecution. Workplace violence is violence against employees and is committed by persons who either have an employment-related connection with the company or are outsiders, and involves:

1. Physical acts against persons or employer property.
2. Verbal threats of physical harm.
3. Written threats, vicious cartoons or notes, and other written material that is meant to threaten or create a hostile environment.
4. Visual acts that are threatening or intended to convey injury or hostility.

All employees are expected to report any act of violence. Employees should bring their concern directly to the attention of their immediate supervisor or to the physician director of human resources for the practice. All such reports shall be fully investigated; employee confidentiality will be maintained to the fullest extent possible; and, when necessary, appropriate action taken to insure the continued safety of our employees and the public. Any employee who takes adverse action against a person who reports any act of violence or a suspicion of violence shall be subject to immediate discipline, up to and including discharge.



Mt. Vernon Internal Medicine

## WORK CONDITIONS & HOURS

### 701    EMPLOYEE CONDUCT AND WORK RULES

To ensure orderly operations and provide the best possible work environment, Mt. Vernon Internal Medicine expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization.

It is not possible to list all the forms of behavior that are considered unacceptable in the workplace. The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment:

Theft or inappropriate removal or possession of property

Falsification of timekeeping records

Working under the influence of alcohol or illegal drugs

Possession, distribution, sale, transfer, or use of alcohol or illegal drugs in the workplace, while on duty, or while operating employer-owned vehicles or equipment

Sexual or other unlawful or unwelcome harassment

Excessive absenteeism or any absence without notice

Unauthorized disclosure of business "secrets" or confidential information

Unsatisfactory performance or conduct

Employment with Mt. Vernon Internal Medicine is at the mutual consent of Mt. Vernon Internal Medicine and the employee, and either party may terminate that relationship at any time, with or without cause, and with or without advance notice.

8/95

EXHIBIT

3

REMBERT-0094

Mt. Vernon Internal Medicine

## WORKING CONDITIONS & HOURS

### 504    PERSONAL TELEPHONE CALLS/LONG DISTANCE TELEPHONE CALLS

Occasionally personal telephone calls may have to be received or made during business hours. A small number of such calls will be permitted, provided they are handled in such a way as not to interfere with your job responsibilities. Try to keep such calls brief, and be ready to interrupt them instantly to handle incoming calls or other business. Expense of long distance calls must be reimbursed.

8/95

EXHIBIT
P-4
tabbies

REMBERT-0088

## E R R A T A   S H E E T

I have read the within and foregoing 58 pages and no changes are required.

This, the _12th_ day of ___June___ , 2013

_Jeffrey Bryphwas_

I have read the within and foregoing 58 pages and the following changes are required:

Page _17_ Line _12_: _It's Not real thick,_

Reason: _____

Page _____ Line _____: _____

Reason: _____

Page _____ Line _____: _____

Reason: _____

Page _____ Line _____: _____

Reason: _____

This, the _____ day of _____, 2013

_____

Sworn to and subscribed before me

this _12th_ day of ___June___ , 2013.

_Patricia Wright_

Notary Public, Georgia

Patricia Wright
Notary Public
Paulding County, Georgia
My Commission Expires on February 2, 2017