IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TANESHA REMBERT, | : | CIVIL ACTION NO. |
| | : | 1:12-CV-2811-WCO-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MOUNT VERNON INTERNAL | : | **ORDER AND NON-FINAL REPORT** |
| MEDICINE, *et al.*, | : | **AND RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT** |

Defendant Mount Vernon Internal Medicine ("MVIM" or "Mount Vernon") terminated Plaintiff in May 2012, ostensibly for "insubordination," improper internet usage and other misconduct. Plaintiff alleges that MVIM instead terminated her because she is African-American and/or in retaliation for her prior complaints about racial discrimination at work. Plaintiff further complains that she was subjected to a hostile work environment on the grounds of race, and that she was the victim of state law torts including assault, battery and intentional infliction of emotional distress, mostly arising from an incident in which her supervisor, Defendant Linda Bauer,[1] physically struck her in February 2012.

---

[1] This Defendant is listed as "Bower" on the Docket, but the correct spelling of her name is "Bauer." *See* Bauer Dep. [119-6] at 4. The Court adopts the latter spelling herein.

This case is before the undersigned on Defendants' Motion for Summary Judgment [112] and five related procedural Motions [133][139][141][171][174]. For the reasons explained below, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART**. The undersigned recommends that summary judgment be **GRANTED** as to Plaintiff's claims of racial discrimination, and that those claims be dismissed, because there is no evidence that Defendant Mount Vernon terminated her, or subjected her to any other materially adverse employment action or to a hostile work environment because of her race.

The undersigned, however, **RECOMMENDS** that summary judgment be **DENIED** as to Plaintiff's claim of illegal retaliation and that this claim be allowed to proceed to trial. According to Plaintiff, Defendant Bauer threatened that Plaintiff would be fired for filing a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"), told Plaintiff that she would be fired as soon as the EEOC case ended, and in fact delivered Plaintiff's termination just days after the EEOC case was dismissed. These and other facts discussed below, which Defendants contest but which the Court is obliged to consider in the light most favorable to Plaintiff, are enough to survive summary judgment on the claim of illegal retaliation.

The same is true with regard to most of the tort claims against Defendant Bauer, which relate principally to the disputed physical striking in February 2012. Thus, as explained below, the Court **RECOMMENDS** that Defendants' Motion be **DENIED IN PART** to the extent that the case be allowed to proceed to trial as to Count Three (Retaliation) and, as to Defendant Bauer only, as to Counts Four and Five (Battery and Assault). Otherwise, the Court **RECOMMENDS** that the Motion be **GRANTED** and that the remaining claims be dismissed.

## I.     PROCEDURAL MOTIONS

Before addressing the actual merits of Defendants' Motion for Summary Judgment, the Court must first spend the following 25 or so pages slogging through numerous motions to strike and other procedural motions filed by both sides, although principally by Defendants. One of Defendants' motions to strike goes through nearly every paragraph of Plaintiff's Affidavit opposing summary judgment, arguing that the language should be stricken as a "sham" or otherwise. The Court sustains the objections to a small number of statements in Plaintiff's Affidavit. For the most part, however, the five procedural motions that will occupy the next 25 or so pages reflect an over-litigation of this case from both sides. Plaintiff initiated the problem with an Affidavit that includes numerous irrelevant and plainly inadmissible statements, largely about immaterial issues.  At the same time, Defendants' Motion reveals overly

aggressive interpretations of certain deposition testimony and/or the basic meaning of the "sham affidavit" rule. The Court generally denies these motions[2] either because there is no ground to strike the evidence or the relief is moot because of the immateriality of the evidence at issue, or both.

A.    DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S AFFIDAVIT

Plaintiff has filed an Affidavit [125-1] in support of her Response [123] in opposition to Defendants' Motion for Summary Judgment. The Affidavit contains 18 paragraphs. Defendants have filed a Motion [139] to strike 16 of those 18 paragraphs.

1.    Legal Standard

In creating an issue of fact in connection with a motion for summary judgment, a party may not rely on an affidavit from an individual that directly contradicts his or her own deposition testimony. An affidavit may be considered a "sham" affidavit "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter

---

[2] The undersigned **DENIES** Defendants' Motion to Strike Plaintiff's Affidavit [139]; Plaintiff's Motion to Strike Exhibits [133]; Defendants' Motion to Strike Plaintiff's Exhibit D [141]; Plaintiff's Motion to File a Sur Reply [171]; and Defendants' Motion to Strike Plaintiff's Surreply Brief [174]. As noted above, Defendants' Motion to Strike [139], while largely meritless, identifies a small number of valid objections to specific material statements in Plaintiff's Affidavit. As explained below, the Court will simply disregard those statements in ruling on the Motion for Summary Judgment and will deny the unnecessary relief of striking the particular sentences from the record, which will only create burdens for the Clerk.

[to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986); *see also Dotson v. Delta Consol. Indus., Inc.*, 251 F.3d 780, 781 (8th Cir. 2001) ("a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition"). A court presented with such an inconsistency in a party's testimony may disregard the later "sham affidavit" in favor of the earlier deposition testimony. *Tippens*, 805 F.2d at 949; *see also Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984); *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1373 (S.D. Ga. 1993).

 This "sham affidavit" rule, however, as set forth in this Circuit and elsewhere, operates to nullify only *unexplained* variations in testimony. *See Van T. Junkins & Assoc.*, 736 F.2d at 656 ("a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony *without giving any valid explanation*.") (emphasis added); *accord S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). When the witness explains his reversal, courts are properly unwilling to discard the revised testimony as a sham. *See, e.g.*, *Pries v. Honda Motor Co.*, 31 F.3d 543 (7th Cir. 1994) (declining to discard affidavit

as sham because plaintiff credibly explained variation in testimony based on later understanding of events); *Waitek v. Dalkon Shield Claimants Trust*, 908 F. Supp. 672 (N.D. Iowa 1995) (finding no sham because medical expert witness gave reasonable explanation for revised opinion presented in affidavit).

Furthermore, the Eleventh Circuit has cautioned courts that, in reviewing affidavits submitted in connection with a motion for summary judgment, an affidavit may not be simply disregarded as a "sham" because it contains information contradictory to other evidence in the record:

> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.

*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (*quoted in Tippens*, 805 F.2d at 954).[3]

---

[3] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

2.      Analysis

a.      Paragraph 3

Paragraph 3 of the Affidavit contains a description of Plaintiff's phone duties. As will be explained in more detail below, Plaintiff served as a clerical employee in the Defendants' medical office and performed certain telephonic and other duties. The crux of the dispute as it relates to the Motion to Strike is that, according to Defendants, Plaintiff's Affidavit describes more advanced telephonic responsibilities than what Plaintiff described in her deposition testimony. The apparent or believed legal significance of this issue relates to Plaintiff's effort to compare the discipline that she received for allegedly violating MVIM's internet use policy with the alleged failure to discipline other employees for engaging in the same violations. Defendants argue that those other employees are not valid comparators because, among other reasons, those employees performed more important tasks than Plaintiff, including as to their interactions with patients and others on the telephone. Thus, Plaintiff's Affidavit attests that she also performed certain telephone tasks.

Specifically, Plaintiff attests in her affidavit that she answered the phone throughout the day, and that her phone duties included taking calls from patients who complained about not getting prescriptions, those who needed appointments, those who needed records sent to other doctors, and those who needed records sent for

insurance claims. Pl. Aff. [125-1] ¶ 3. Defendants argue that these statements contradict Plaintiff's deposition testimony, which Defendants describe as saying only that she retrieved voice mails left by patients who needed prescriptions or who had other complaints. *See* Def. Brf. [139-1] at 5 (citing Pl. Dep. [112-4] 154:3-25; 155:1).

The Court **DENIES** the request to strike this portion of the Affidavit for two reasons. First, the Court is unable to conclude from reviewing the cited passages of Plaintiff's deposition that she clearly and unambiguously stated that she never answered the telephone and spoke to a live person.[4] In the cited passages of her deposition she referred to taking messages off the phone, but she was not asked and she did not clearly state that this was her only telephone-related responsibility. Second, however, the Court also concludes that this dispute is immaterial and that the Motion should be denied if nothing else as moot. As explained in detail below, the Court agrees with Defendants for other reasons that Plaintiff's comparison to the other

―――――――――――――――

[4] As to this and other alleged contradictions discussed below, it may be that the alleged contradictions could be presented at trial and a jury could find that Plaintiff contradicted herself. Weighing a witness's testimony with prior statements, determining whether an inconsistency exists, and resolving the credibility of the witness, are a classic responsibilities for the finder of fact. The question before the Court is simply whether a contradiction so clearly and unambiguously exists such as to justify the extreme remedy of striking Plaintiff's affidavit testimony as a matter of law as a "sham." The Court generally rejects this argument as explained below, but nothing about this ruling limits Defendants' ability to attempt to characterize these prior statements as contradictory for trial purposes.

two employees in question fails to show an inference of discrimination. The Court does not find that the added distinction Defendants attempt to assert, that is, a difference between whether Plaintiff answered live telephones or not as part of her clerical duties, would strengthen Defendants' argument in this regard. As explained below, Defendants have introduced evidence of a universally-applicable ban on certain personal internet use in the office. There is no basis in the evidence to argue that a clerical employee who answers telephones would be subject to more lenient discipline for violating this policy than one who does not. This issue, in other words, simply does not matter.

b.       Paragraphs 4, 6, 14 and 15

Paragraphs 4, 6, 14 and 15 relate to Plaintiff's work performance. Plaintiff states, *inter alia*, that fellow employee Reanda Roberts did not help her with her work; that she did not leave charts unfiled or notes unattended; did not file records incorrectly; was not counseled about timely pulling faxes or placing notes in charts or doctors' mailboxes; and that she was not counseled for failing to take direction from Plaintiff Bauer. *See* Pl. Aff. [125-1] ¶¶ 4, 6, 15. Defendants argue that these statements contradict Plaintiff's deposition testimony, in which she acknowledged being counseled about improper filing of medical records at least during a period of time during her employ. *See* Def. Brf. [139-1] at 5-6.

9

Plaintiff testified in her deposition, and it is undisputed that, at least for a period during 2010, Plaintiff was "overwhelm[ed]" and had "problems performing" certain medical filing tasks, and she was on performance-related probation for approximately 30 days. *See* Pl. Dep. [119-1] at 50-52; Pl. Resp. SOMF [124] ¶ 18. Plaintiff attributes this problem to being required to do the work of two people for that period, but it is undisputed that there was a problem and that she was placed on probation. *Id.* Plaintiff also admitted in her deposition that she was "counseled" about these issues. *See* Pl. Dep. [119-1] at 50-53. Thus, to the extent Plaintiff's Affidavit could be read as suggesting that she was never criticized, counseled or made aware of performance-related problems with her work, that would contradict the earlier deposition testimony and Defendant's Motion to Strike would have merit.

However, in reading the Affidavit in its entirety and in the light most favorable to the Plaintiff, the Court finds no clear and unambiguous contradiction. In a paragraph not cited by Defendants, Paragraph 14, Plaintiff makes clear that she is not denying that she ever had a performance problem. Rather, in Paragraph 14, she states that "[m]y work performance had not been an issue for years before I filed this complaint." Pl. Aff. [125-1] ¶ 14. She acknowledges the "performance review" that occurred in 2009, which appears to be the same 30-day probationary period; she reiterates the explanation for the problem that she provided in her deposition (that

10

"there were two people doing my job and they fired the other person"); and she goes on to assert that she has not received any notice of performance-related problems *since that time* and to the contrary received two raises. *Id.* The Court does not find that this discussion clearly and unambiguously contradicts the deposition. To the extent the other paragraphs cited by Defendants could be read as otherwise denying performance-related problems, the Court reads those statements in conjunction with Paragraph 14, and therefore interprets the Affidavit as a whole as denying performance problems *except* for the undisputed 2009 incident that led to probation. Thus, there is no contradiction that the Court can clearly and unambiguously identify. The undersigned thus **DENIES** Defendants' Motion [139] as to these paragraphs.[5]

c.    Paragraph 5

Plaintiff in Paragraph 5 states that Linda Bauer, Plaintiff's supervisor, dealt with Medicare and Medicaid billing. Plaintiff also states that "I have no personal knowledge of a conversation between the Physician-Defendants and Ms. Bauer, by

---

[5] Defendants object to Plaintiff's testimony in Paragraph 15 in her Affidavit that describes Defendants' previous firing of an employee named Mahogany Thomas, and the reasons and circumstances for the firing, and speculates that Defendants may have intended to treat Plaintiff in a similar way. *See* Def. Brf. [139-1] at 6. The Court agrees that Plaintiff has not established that she has personal, non-hearsay knowledge of the circumstances that occurred with Ms. Thomas, and has no basis to speculate as to whether Defendants had the same "plan for [Plaintiff]." Pl. Aff. [125-1] ¶ 15. The Court will simply disregard these plainly immaterial and inadmissible statements as opposed to striking them.

which she asked them not to fire me. This is what Linda told me later." Pl. Aff. [125-1] ¶ 5. Defendants object to these statements as inadmissible in that Plaintiff lacks direct personal knowledge of these issues. *See* Def. Brf. [139-1] at 7. The Court certainly questions the admissibility of these statements, but denies the objections at this time as moot, because the statements have no bearing on the issues before the Court on the Motion for Summary Judgment. The Court cannot perceive any materiality as to whether Ms. Bauer handled Medicare and Medicaid billing. And Plaintiff's statement denying knowledge of the conversation among the Defendants – which was not a conversation that she was supposedly a part of – is of no particular significance at all.  Plaintiff's lack of knowledge of a statement uttered outside of her presence does not tend to prove or disprove whether this statement occurred, or any other fact believed to be pertinent.

> d.    Paragraphs 7 and 11

Defendants challenge Paragraphs 7 and 11 in terms of the assertions Plaintiff makes regarding whether she complied with office computer/internet policies. *See* Def. Brf. [139-1] at 7-9. Plaintiff asserts that "I used the office computer during work hours when I was on my lunch." Pl. Aff. [125-1] ¶ 7. Plaintiff also states, "I did not use the company computer to log onto Facebook." *Id*. ¶ 11.

Defendants argue that these paragraphs should be stricken because "[i]t is undisputed that Plaintiff used the office computer to access Facebook during working hours, was repeatedly warned against using social media . . . while at work and was well aware that she was not supposed to log onto Facebook outside of the time permitted by MVIM." Def. Brf. [139-1] at 7. Defendants point to Plaintiff's testimony in a Georgia Department of Labor hearing that she was warned about Facebook use; to the Facebook records that Plaintiff produced in discovery to support this contention; and to other business records supposedly contradicting her statements about internet and mobile phone use. *See id.* at 8.

The Court rejects Defendants' arguments. First, Defendants misstate or take out of context Plaintiff's Department of Labor testimony. Defendants cite to page 48 of the transcript of that hearing, in which Defendant Bauer asked Plaintiff "How many times did I talk to you about being on Facebook in the office? Was it more than 10 times?" and Plaintiff responded "I'm gonna say less." Def. Ex. P [115-1] at 48. Defendants cite this exchange as support for the assertion that Bauer specifically warned Plaintiff about improperly using Facebook at least less than ten times. Immediately after this exchange, however, the hearing examiner asked why this discussion was even relevant – because it was undisputed that employees could use Facebook for much of the relevant period during the lunch hour – and Bauer re-

13

phrased the question to "how many times I warned [you] of being on Facebook while [you] were working." *Id.* at 49. In response to that, in testimony Defendants did *not* cite in their brief, Plaintiff *denied* using Facebook during work hours, and *denied* being reprimanded about this by Bauer (at least prior to a February 17, 2012 incident that will be discussed at length below). *See id.* Plaintiff also stated that to the extent Bauer discussed internet use, it was in general staff meetings, not specific reprimands or warnings addressed to her. *Id.* This generally comports with Plaintiff's deposition testimony.   The Court therefore finds no clear and unambiguous contradiction between this testimony and Plaintiff's statements in her deposition, or in her Affidavit.

To the extent Defendants argue that Plaintiff's denial of Facebook and other social media use should stricken because it contradicts information Defendants obtained in discovery showing Plaintiff's Facebook use, including data memorializing when she logged on and off from the Facebook site, Defendants significantly misunderstand the limited purpose of the "sham affidavit" rule. That rule is limited to where an affiant directly and clearly contradicts her own prior sworn testimony. The rule does not empower the courts to resolve contradictions between an affiant's testimony and other evidence obtained in discovery in the case, including a third party's (like Facebook's) business records. Defendants may have great success impeaching Plaintiff at trial with or otherwise taking advantage of records of her log-

on/log-off times, as well as with posts that she made on Facebook. But the Court cannot resolve this competing evidence in the context of summary judgment, or declare an affidavit to be a sham simply because it contradicts Defendants' interpretation of documentary evidence obtained in the case.

e.      Paragraph 8

Plaintiff in Paragraph 8 testifies that Linda Bauer apologized to her in front of the police officer Plaintiff called after Bauer struck Plaintiff. *See* Pl. Aff. [125-1] ¶ 8. Plaintiff states that she believes that Bauer "only did so because she didn't want me to press charges." *Id*. Defendants argue that Plaintiff's testimony as to Bauer's reasons for apologizing are outside of Plaintiff's personal knowledge and should therefore be stricken. *See* Def. Brf. [139-1] at 9. Defendants are obviously correct that Plaintiff cannot opine as to Bauer's subjective mindset vis-a-vis this apology. But this issue is also equally obviously immaterial because whether this case proceeds to trial will not turn on the subjective sincerity of Bauer's apology. The undersigned thus **DENIES** Defendants' Motion as moot on this point.

f.      Paragraph 9

Plaintiff in Paragraph 9 recounts how the Defendant MVIM's personnel manual's section on Problem Resolution directs employees to report problems to one's supervisor. *See* Pl. Aff. [125-1] ¶ 9. Plaintiff states that she reported unspecified concerns to Mr. Miller, Defendants' Business Manager, but that she does not know whether Miller reported Plaintiff's concerns to others in authority. *See id*. Defendants argue that Plaintiff contradicts herself as to Miller's lack of action in her response to Defendants' asserted Material Fact 56, in which Plaintiff asserts that she believes Miller reported her concerns. *See* Def. Brf. [139-1] at 10. Plaintiff's response to this argument does not address this apparent inconsistency.

Regardless, what Plaintiff believes or does not believe Miller did or did not do is immaterial to any of Plaintiff's substantive claims, particularly given that this assertion does not specify the issues about which Plaintiff complained, and there appears to be no suggestion that Miller was actually Plaintiff's supervisor. This assertion does not, therefore, shape the undersigned's consideration of Plaintiff's discrimination or retaliation claims, as explained below. The undersigned thus **DENIES** this portion of Defendants' Motion as moot.

16

g.      Paragraphs 10, 16 and 17

Plaintiff's testimony in Paragraphs 10, 16 and 17 relate to a key incident on February 17, 2012 – discussed repeatedly in the analysis of the summary judgment motion – during which Defendant Bauer allegedly struck Plaintiff with a stack of medical records. *See* Pl. Aff. [125-1] ¶¶ 10, 16, 17 ("I cried out: you hit me."; "Mrs. Bauer used curse words . . . . This language, coupled with Ms. Bauer's conduct on February 17, 2012, caused me to be in more fear of physical harm . . ."; "She made me fear for my physical well being . . ."). Defendants argue that these paragraphs, including Plaintiff's references to fear of physical harm after the incident, contradict Plaintiff's deposition testimony, in which Plaintiff mentioned no such fear "on the way out of the office after the incident." Def. Brf. [139-1] at 10. The apparent legal significance of this discussion relates to Plaintiff's Assault claim against Defendant Bauer, which requires Plaintiff to show a reasonable apprehension of physical harm. It is undisputed that Plaintiff did not see and had no prior apprehension of the actual strike from Bauer on February 17, and therefore the viability of the Assault claim turns on whether Plaintiff subsequently was in reasonable fear of being struck *again*.

The Court finds no clear and unambiguous contradiction in the paragraphs at issue. While Plaintiff in her deposition never discussed her post-attack fear of being struck again, neither did Defendants ask questions to precisely pin Plaintiff down on

this subject. *See* Pl. Dep. [112-4] 106:12-25. The Court simply does not find the questions and answers sufficiently clear to merit excision.

Defendants also urge the Court to strike Plaintiff's statement in Paragraph 16 regarding how Plaintiff felt about Bauer's alleged use of the words "ass" and "hell." *See* Def. Brf. [139-1] at 11. Defendants argue that these statements of feeling are "self-serving, legal conclusions and seek to create a genuine issue of material fact." Def. Brf. [139-1] at 11. The Court disagrees. Plaintiff's feelings resulting from the use of these words may not be particularly probative (if at all), but they are not "legal conclusions." And that a party's statements in support of its claims are "self-serving" is not a valid objection by itself if those statements are otherwise relevant, not hearsay and made with personal knowledge.[6]

_____

[6] Arguably, the language and tone Bauer used are relevant to Plaintiff's claims of Assault and Intentional Infliction of Emotional Distress ("IIED"), both of which require proof of what feelings the Defendant's actions would have instilled in an objective person. Plaintiff's own subjective feelings may also be relevant to show the existence of severe emotional distress, which is arguably relevant to the IIED count, and ultimately to any award of emotional distress damages. In any event, the import these statements have on the resolution of the summary judgment motion is best left to the substantive discussion of that Motion and not as part of procedural "objections" asserting that a plaintiff's description of her own emotional state is somehow inadmissible as "self-serving" or a "legal conclusion."

Finally, Defendants argue that Plaintiff's testimony in Paragraph 17 that "Ms. Bauer knows that others told Pat Wright that Ms. Bauer was wrong for hitting me . . ." and that "Other employees witnessed Ms. Bauer['s] conduct towards me" should be stricken as speculative, hearsay, and otherwise vague. *See* Def. Brf. [139-1] at 11; Pl. Aff. [125-1] ¶ 17. Regardless of the merits of Defendants' arguments, the testimony, even if accepted as true, is immaterial to the issues Defendants raise in their Motion for Summary Judgment regarding Plaintiff's Battery, Assault and Hostile Work Environment claims. Plaintiff offers her own testimony that Bauer struck her, which testimony the Court is obliged to accept as true. Whether another witness saw the incident, and/or opined that Bauer was "wrong," has no bearing at all on the award of summary judgment. The undersigned thus **DENIES** this portion of Defendants' Motion as moot.

h.      Paragraph 12

Plaintiff in Paragraph 12 states that she was not allowed to eat at her desk after filing her EEOC complaint, while her coworker Ms. Gregory was allowed to do so. *See* Pl. Aff. [125-1] ¶ 12. Plaintiff states that she told Mr. Miller, Ms. Torrence and Dr. Cohn about this disparity, but that Dr. Cohn was not interested in discussing the issue. *See id.*

Defendants argue that this statement should be stricken because Plaintiff in her deposition said she could not remember the date when Linda Bauer told her not to eat at her desk. *See* Def. Brf. [139-1] at 11-12. Defendants also argue that this statement is contradictory because Plaintiff did not say during her deposition, as she does in her Affidavit, that Ms. Gregory was allowed to eat breakfast and lunch at her desk. *See id*. Defendants also argue that Plaintiff in her Affidavit recounts complaining about how she could not eat at her desk, while she testified in her deposition that she did not make any such complaints. *See id*.

Defendants' Motion to Strike is meritorious as to these statements in one respect. To the extent Plaintiff attests in her Affidavit that she complained to Dr. Cohn (or any other physician at MVIM) or Ms. Bauer that Caucasian employees were allowed to eat at their desks and use the internet while she and other African-American employees were not, that testimony directly contradicts Plaintiff's prior testimony. *See* Pl. Dep. [112-3] at 86:19-88:5. Plaintiff was clearly asked in a series of questions whether she raised these concerns with Dr. Cohn, Ms. Bauer, or any other MVIM physician, and she clearly and repeatedly testified "no." *Id.* Plaintiff cannot, without explanation, change that testimony now in her affidavit and the specific language regarding complaining to Dr. Cohn (or "Cohen," as Plaintiff appears to occasionally refer to Dr. Cohn) in Paragraph 12 will be disregarded.

20

Otherwise, the Court finds no clear and unambiguous contradiction. For example, that Plaintiff could not recall a date in her deposition, *see* Pl. Dep. [112-4] at 146:4-8, but then was able to recall that date in her later Affidavit, is not a clear and unambiguous contradiction meriting striking this paragraph. That may be ripe fodder for cross-examination, but subsequently remembering a date previously forgotten is not fraud or a sham as matter of law. The other arguments by Defendants are similarly meritless, and ultimately immaterial as will be reflected in the summary judgment analysis below.

i.      Paragraph 13

Plaintiff in Paragraph 13 states that she filed her EEOC charge because she was being discriminated against on the basis of race, specifically because Caucasian employees were treated differently than she was, including that she was forced to do excess work and was not fairly compensated. *See* Pl. Aff. [125-1] ¶ 13. Defendants argue that this statement is contradictory because Plaintiff in her deposition testified that she filed the EEOC charge because of the way she was treated on February 17, 2012; because Linda Bauer talked to her in a "smart" way; because she was overwhelmed by having to do other people's work; and because of her pay rate. *See* Def. Brf. [139-1] at 12-13.

Plaintiff's comment in Paragraph 13 that Defendants "put work on me unfairly and didn't pay me fairly" is consistent with her deposition testimony. *See* Pl. Aff. [125-1] ¶ 13 and Pl. Dep. [112-4] at 142:9-22. To the extent Plaintiff adds new comments to her deposition testimony, such as her comments about being singled out or that she told Linda Bauer that Bauer was a racist, the Court considers those comments to be elaboration, rather than comments so inconsistent as to merit striking. Regardless, the reasons for Plaintiff filing her EEOC charge are immaterial to whether Plaintiff's retaliation claim can survive summary judgment. The issue, in other words, is not *why* Plaintiff filed the charge, but instead *that* she participated in a protected proceeding, and was retaliated against for doing so, as explained below. The undersigned thus **DENIES** this portion of Defendants' Motion.

j.      Paragraph 18

Plaintiff in Paragraph 18 discusses the stress she experienced in her relationship with Linda Bauer and how she reacted to that stress by going to church and by wanting to drink more. *See* Pl. Aff. [125-1] ¶ 18. Plaintiff also states that she posted her related thoughts on the internet (presumably to her Facebook page). *See id*. Defendants argue that this statement should be stricken because the Facebook postings Plaintiff cites in support were produced outside of the discovery period, and because

22

they are "in conflict with Plaintiff's assertions regarding whether her Facebook postings reflect her emotional distress or not." Def. Brf. [139-1] at 14.

The Court rejects Defendants' arguments. Again, as explained above, the Court cannot strike Plaintiff's sworn affidavit testimony because it contradicts Defendants' interpretations of her unsworn Facebook posts – this is not the purpose of the "sham affidavit" rule. Moreover, the sham affidavit rule allows an affiant to explain a difference between her testimony and prior statements, and here Plaintiff states that her Facebook posts do not necessarily always reflect her emotional state. It is not the Court's role to reject this and to resolve contradictions between contradictory evidence.

Ultimately, moreover, what Plaintiff did or did not post to Facebook is immaterial to the Court's ruling as to Defendant's Motion for Summary Judgment on Plaintiff's claim for Intentional Infliction of Emotional Distress, as explained below. Even considering these postings, Plaintiff fails to state a claim for this tort. The undersigned thus **DENIES** Defendants' Motion as to this statement as moot.[7]

---

[7] Because the undersigned views the consideration of the Facebook posts allegedly not previously produced in discovery to be immaterial for purposes of resolving this motion, the undersigned does not resolve the merits of the alleged discovery failure.  To the extent Plaintiff wishes to use this evidence for other purposes at trial, this will be an evidentiary matter to raise at the appropriate time in advance of trial.

B.   PLAINTIFF'S MOTION TO STRIKE EXHIBITS

Plaintiff has filed a Motion to Strike Exhibits [133]. Plaintiff complains that Defendants filed extraneous, non-pertinent material with their Notice of Filing [132]. *See* Pl. Mot. [133] at 1-2.

As background, because Plaintiff's counsel faced difficulties in e-filing Defendant Bauer's interrogatory responses, Plaintiff's counsel requested that Defendants assist by filing the full interrogatory responses. *See id.* Apparently, in doing so, Defendants also filed exhibits to those interrogatory responses that Plaintiff argues fell outside the filing request that Plaintiff's counsel made and are otherwise extraneous and not relevant. *See id.* This material apparently consists of portions of Plaintiff's personnel file. *See id.* Defendants respond by arguing that the material was part of the interrogatory responses and therefore within the scope of Plaintiff's request.

This Motion reflects the height of procedural absurdity and over-litigation. Regardless of why the allegedly "extraneous" material was filed, it has no bearing on the resolution of the Summary Judgment Motion unless it is cited in support of specific facts asserted in either of the parties' proposed statements of material facts. The Court has not considered this material here, to the extent it was not included as an exhibit to Defendants' Statement of Material Facts or otherwise properly cited to

24

in the summary judgment record. There is no need for any other relief. The Court thus **DENIES** Plaintiff's Motion [133] as moot.

###### C.      DEFENDANTS' MOTION TO STRIKE EXHIBITS

Defendants have filed a Motion to Strike Plaintiff's Exhibit D [141]. Defendants argue that certain pages in Exhibit D related to Plaintiff's Facebook posts were not timely produced to Defendants and should be stricken on that basis. *See id*. Plaintiff responds by essentially arguing that she produced similar postings espousing Plaintiff's religious sentiments and, thus, Defendants were on notice that Plaintiff would rely on this material. *See* Pl. Resp. [153] at 2-4. Plaintiff seeks to elaborate on this position in a proposed sur-reply, which is the subject of further objections described below.

For all of the reasons discussed above with regard to Defendants' efforts to strike the portions of Plaintiff's Affidavit relating to these Facebook posts, the undersigned also **DENIES** Defendants' Motion [141] as **MOOT**.

###### D.      PLAINTIFF'S MOTION FOR SURREPLY AND DEFENDANTS' RELATED MOTION TO STRIKE

Plaintiff has filed a Motion for Leave to File a Surreply [171] and a proposed Surreply Brief [172]. Plaintiff asks leave to do so "to correct Defendants' claim that Plaintiff failed to timely disclose the content of" certain of Plaintiff's social media

postings." Pl. Mot. [171] at 1. Defendants oppose that Motion [171] and have filed a Motion to Strike [174]. Defendants argue that Plaintiff has not presented a valid rationale for filing a surreply, such as where a movant raises new arguments or facts in their reply brief. *See* Def. Brf. [174-1] at 2. Defendants further argue that Plaintiff asserts the same arguments she makes in her Response [153] to Defendants' Motion to Strike Plaintiff's Exhibit D [141] as she does in her proposed surreply. *See* Def. Resp. [173] at 4. Thus, Defendants argue, a surreply is not necessary.

Defendants are correct that a party is not ordinarily permitted to file a surreply under the Local Rules except upon order of the court. *See* LR 56.1A, NDGa; *see also Byrom v. Delta Airlines, Inc.*, 343 F. Supp. 2d 1163 (N.D. Ga. 2004) (Carnes, J.); *Garrison v. N.E. Ga. Med. Center, Inc.*, 66 F. Supp. 2d 1336 (N.D. Ga. 1999) (O'Kelley, J.). Nevertheless, granting permission to file a surreply is within the discretion of the court. *See Telecomm Technical Services v. Siemens Rolm Communications, Inc.*, 66 F. Supp. 2d 1306, 1310 (N.D. Ga. 1998) (Hunt, J.) (granting defendant's motion for leave to file surreply even though such motion was opposed by plaintiff).

Here, however, the Court's discretion is not relevant because the Facebook posts at issue, *see* Pl. Ex. D [129-1], are immaterial to whether the District Court should grant Defendants' Motion for Summary Judgment. The posts relate mainly to

Plaintiff attending church. The undersigned does not find that these postings create an issue of material fact that precludes summary judgment with regard to Plaintiff's Intentional Infliction of Emotional Distress claim, as explained below. Thus, the undersigned **DENIES** Plaintiff's Motion for Leave to File Surreply [171] and, by extension, **DENIES** Defendants' Motion to Strike same [174] as moot.

## II.   FACTS

Unless otherwise indicated, the Court draws the following facts from Defendants' Statement of Undisputed Material Facts in support of their Motion for Summary Judgment [112-2] ("Def. SOMF"); Plaintiff's Response [124] thereto; Plaintiff's Statement of Material Facts [123-2]; and Defendants' Response [138] thereto. These facts are either undisputed, not properly disputed (and therefore considered to be undisputed), or are properly-disputed facts interpreted in the light most favorable to the Plaintiff.

### *Defendant MVIM*

Until September 1, 2012, MVIM was a medical practice organized as a limited liability partnership with three physicians, Dr. Tinanoff ("Tinanoff"), Dr. Polekoff ("Polekoff") and Dr. Cohn ("Cohn"). Def. SOMF [112-2] ¶ 2. Between February 28, 2008 and May 30, 2012, the practice employed approximately fifteen employees, 12 African-Americans and three Caucasians, including the Practice Administrator. *Id.*

MVIM had a policy in place entitled "Work Conditions and Hours" - "Problem Resolution. Pl. SOMF [123-2] ¶ 20.

### Plaintiff

Plaintiff, an African-American woman, was employed as a Medical Records Clerk at Defendant Mount Vernon Internal Medicine, LLP ("MVIM") from February 28, 2008 to May 30, 2012. Def. SOMF [112-2] ¶1; *see also* Pl. SOMF [123-2] ¶ 1.

### Plaintiff's Job Responsibilities

Plaintiff's job duties included: pulling faxes, obtaining patients' charts and attaching them to physician's notes, retrieving voicemail messages from physicians' or her on voicemail left by patients who called in prescriptions or needed to come in, and taking handwritten notes of these messages. Def. SOMF [112-2] ¶ 3. She also assisted with scheduling, handling insurance companies, taking co-payments, checking patients in and out, dealing with drug representatives, obtaining physician signatures and answering the phones. *Id*. Plaintiff also filed; took notes from doctors and nurses that she attached to charts; and answered the phone when patients called complaining of getting prescriptions or needing to come to the office. Pl. SOMF [123-2] ¶ 2.

Plaintiff pulled faxes regularly, took handwritten notes from the voicemail messages left by patients, attached them to the correct patient's chart and placed them in the physicians' mailbox. Def. SOMF [112-2] ¶ 4. The extent of Plaintiff's telephone-related responsibilities are disputed, as discussed in Section I(A)(2)(a) above.

From 2009, the following duties were added to Plaintiff's job description: working the front window; scheduling; dealing with the insurance companies; taking co-payments; checking patients in and out; dealing with the drug representative's samples, and getting signatures from MVIM doctors. Pl. SOMF [123-2] ¶ 2.

Prior to March 2010, two people performed Plaintiff's job. *Id*. ¶ 4. MVIM fired the second individual, but did not provide a replacement to assist Plaintiff. *Id*. At that point, Plaintiff was required to do a two-person job. *Id*. In 2010, Plaintiff was overwhelmed from doing the work of two employees. *Id*. ¶ 3. Plaintiff complained to her then supervisor, Brenda Torrence. *Id*. ¶ 3. Plaintiff also complained to two of her co-workers, Dion Miller, a Manager, and Yolanda Dennis. *Id*.

Plaintiff's then supervisor, Ms. Skeggs (Practice Manager) noticed that Plaintiff was having problems and brought the issue to Plaintiff's attention. Pl. SOMF [123-2] ¶ 4. However, Ms. Skeggs did not threaten Plaintiff with any disciplinary action and

only gave Plaintiff 30 days to get shelves organized. *Id.* Plaintiff successfully met the 30 day requirement. *Id.*

Plaintiff was not on probation at the time that Bauer became Practice Manager. *Id.* ¶ 5. When Ms. Bauer was the Practice Manager (beginning in March 2010), Plaintiff was still overwhelmed with her work. *Id.* ¶ 6. Plaintiff continued to complain, and she complained to Ms. Bauer. *Id.* Additionally, Plaintiff asked Ms. Bauer for a raise to compensate her for the workload. *Id.*[8]

Plaintiffs starting salary was $9.00 per hour. Def. SOMF [112-2] ¶ 6. She received a raise to $10.00 per hour and later to $11.75 per hour after Ms. Bauer became Practice Administrator. *Id.* Plaintiff received a bonus in 2011 in addition to dental and parking benefits. *Id.* ¶ 7.

### Plaintiff's Other Supervisors

Plaintiff worked in the front office under the immediate supervision of Brenda Torrence, an African-American. *Id.* ¶ 8. At the start of her employment, the Practice Manager was Karen Downy, and Plaintiff's immediate supervisor was Eileen. Pl. SOMF [123-2] ¶ 1. After Downy left, Donna Steggs became the Practice Manager. *Id.* Linda Bauer became Practice Manager in March 2010. *Id.*

---

[8] The two sides dispute how many times Plaintiff asked for a raise. *See* Def. Resp. [138] ¶ 6.

After Eileen left, Brenda Torrence became Plaintiff's immediate supervisor. *Id*. Ms. Torrence was Plaintiff's supervisor from 2010 to June 2011; Briana Weese, a Caucasian, was Plaintiff's immediate supervisor from June 2011 to May 24, 2012. Def. SOMF [112-2] ¶ 8.[9] Reandra Roberts stepped in as Plaintiff's supervisor whenever her immediate supervisor was absent. *Id.* Plaintiff also reported to the Practice Administrator. *Id.*

Ms. Torrence, Ms. Weese, Rebecca Gregory, a Caucasian, and Plaintiff all worked together in the front office between 2010 and May 2012. *Id*. ¶ 9. Other than Ms. Weese and Ms. Gregory, there were no other Caucasians working in the front office between 2010 and 2012. *Id.*

**Comparators**

Ms. Weese worked at MVIM as a Front Desk Receptionist until May 25, 2012. *Id*. ¶ 10. Her job duties included checking-in patients, collecting copays, updating insurance, pulling patient charts and creating new charts for new patients. *Id*. For a few months prior to her last day at work in 2012, Ms. Weese sometimes assisted Plaintiff with placing telephone messages in the physicians' mailboxes. *Id.* Filing charts was not one of Ms. Weese's job duties. Def. SOMF [112-2] ¶ 10.

---

[9] Plaintiff asserts that Weese was Plaintiff's supervisor for six months. Pl. SOMF [123-2] ¶ 1. This dispute is not, however, material to the undersigned's adjudication of the instant Motion.

Ms. Gregory has been employed as the Appointment Scheduler at MVIM for over ten years. *Id.* ¶ 11. Her duties involve scheduling patient's appointments and answering the telephone during practice business hours and talking to patients directly on the phone. *Id.* Ms. Gregory did not assist Plaintiff with any of her job duties. *Id.* Her work hours were from 8:00 a.m. to 5:00 p.m. with an alternating lunch hour from 12:00 p.m. to 1:00 p.m. and 12:30 p.m. to 1:30 p.m. *Id*.

### *Plaintiff's Work Schedule*

Prior to April 30, 2012, Plaintiff's work hours were from 7:30 a.m. to 4:30 p.m. with an hour for lunch break. *Id.* ¶ 12. On or around May 1, 2012, her work hours changed to 8:00 a.m. to 5:00 p. m. in order to address Plaintiff's repeated tardiness to work. *Id.*

Between January 2011 and February 17, 2012, Plaintiff generally took her lunch break between 1:00 p.m. and 2:00 p.m. Def. SOMF [112-2] ¶ 13. From February 23, 2012 to May 30, 2012, she took her lunch between 11:30 a.m. and 12:30 p.m. *Id.* During her lunch break, Plaintiff either ate outside of the office or inside the break room or she would use the Computer at her desk but she did not eat lunch at her desk. *Id.* ¶ 14.

On April 30, 2012, Ms. Bauer prepared a Performance Improvement Status Report noting that Plaintiff was tardy 19 times in six weeks. *Id.* ¶ 81. Plaintiff does not deny this. *Id.* At the time, she requested that her schedule be modified to 8:00 a.m. to 5:00 p.m. and Bauer approved the change effective on May 1, 2012. *Id.*

### Linda Bauer

Ms. Bauer, a Caucasian, was hired by MVIM as the Practice Administrator in March 2010 and was responsible for handling payroll, coordinating the business activities of the practice, reconciling bank accounts, negotiating insurance contracts, and human resources. *Id.* ¶ 15.

At the time of her hire, the physicians advised Ms. Bauer that they had decided to terminate Plaintiff for performance-related issues. Def. SOMF [112-2] ¶ 17. At that time, Plaintiff had been on probation on January 12, 2010 for lack of organization of medical records, specifically, for failing to get shelves organized alphabetically and not handling appropriately and timely faxes and medical reports. *Id.* ¶ 18. Ms. Torrence, her supervisor at the time, issued a status report at the end of the probationary period stating that Plaintiff was being counseled to maintain records and if not, there may not be a final warning. *Id.* ¶ 19.

Ms. Bauer asked the physicians not to fire Plaintiff and to give her a chance to work with Plaintiff. *Id.* ¶ 20.[10] The physicians complained to Ms. Bauer about Plaintiffs filing errors. *Id.*

### *MVIM'S Internet Usage Rules*

When Plaintiff started working for MVIM in 2008, the company did not have Internet; however, it eventually started using Internet. Pl. SOMF [123-2] ¶ 7.

Plaintiff was assigned a computer, however, other employees also used her computer to check-in patients. Def. SOMF [112-2] ¶ 25; *see also* Pl. SOMF [123-2] ¶ 29 (sic) at 13.

Defendant MVIM instituted an internet and email policy in 2009 restricting employees from using the internet on its company-owned computers and on any personal computer networked with MVIM to business purposes only. Def. SOMF [112-2] ¶ 22. All employees were required to acknowledge their receipt of this policy. *Id.* Plaintiff was made aware of the internet policy and signed her acknowledgment of same on May 1, 2009. *Id.* ¶ 23. Despite this general policy, however, Bauer

---

[10] Defendants assert that Plaintiff's performance did not improve. *Id.* ¶ 21. Plaintiff disputes this assertion by testifying in her Affidavit that, other than being counseled for filing issues in 2009, she performed her job correctly. *See* Pl. Aff. [125–1] ¶¶ 4, 6. For the purposes of this Motion, the Court assumes that other than during the probation period in 2009, Plaintiff otherwise received no negative performance reviews or performance-related reprimands.

subsequently made a verbal exception allowing for internet use during the lunch hour. *See* Pl. Resp. [124] ¶ 22; Pl. Dep. [119-1] at 73.

On February 20, 2012, MVIM reinstated its original internet policy banning all social media and internet use on company computers both during work and lunch hours. Def. SOMF [112-2] ¶ 55. Plaintiff testified that she learned about the MVIM's prohibition against all internet use both during work and lunch hours on February 23, 2012. *Id*.[11]

**Plaintiff's Internet Usage**

Evidence obtained during discovery, but not apparently known to Defendants during Plaintiff's employment, show that Plaintiff logged onto Facebook during her work hours as evidenced by her Facebook Log on/off history. According to Defendants' interpretation of these records, Plaintiff logged onto and made postings on Facebook during working hours on each of the following dates: 04/05/10 at 11:06 a.m.; 08/31/10 at 4:10 p.m.; 09/08/10 at 12:50 p.m.; 09/17/10 at 11:40 a.m.; 09/21/10 at 8:27 a.m.; multiple times on 09/27/10 between 2:09 p.m. and 2:15 p.m.; 04/06/11 at 11:55 a.m.; 05/05/11 at 7:35 a.m., 7:36 a.m. and twice at 7:37 a.m.; five times on

---

[11] An acknowledgment form purporting to bear Plaintiff's signature, and purporting to memorialize her receipt of the new policy on February 20, 2012, was not, in fact, signed by or provided to Plaintiff. *See* Pl. SOMF [123-2] ¶ 32 (sic) at p. 13.

07/18/11 between 10:06 a.m. and 11:42 p.m. and at 4:07 p.m.; twenty-three times on

08/03/11 between 2:05 p.m. and 4:26; 08/08/11 at 12:34 p.m.; 12/02/11 at 2:32 p.m.,

2:33 p.m. and 4:24 p.m.; on 12/22/11 at 9:24 a.m., 2:24 p.m. and 2:27 p.m.; on

01/26/12 at 12:51 p.m. and twice at 1:41 p.m.; and three times on 02/10/12 at 11:04

a.m., 12:39 p.m. and 12:48 p.m. *Id. ¶* 26.  Plaintiff's Time Card Report shows that all

of the dates and times listed above were during Plaintiff's work hours. *Id.*[12]

Plaintiff testified that she logged onto Facebook at least every other day. *Id.* ¶

27.  Plaintiff made several postings on her Twitter and Facebook accounts. *Id*. ¶ 34.

### Comparators' Internet Use

After February 17, 2012, Ms. Weese and Ms. Gregory (both Caucasian)

continued to use the Internet during working hours, and during lunch, and Ms. Weese

logged onto her Facebook account. Pl. SOMF [123-2] ¶ 11. Ms. Weese and Ms.

Gregory worked next to Plaintiff. *Id*.

### Plaintiff's Complaints About Disparate Treatment

Plaintiff told Dion Miller, a Manager, and Brenda Torrence that Ms. Bauer was

treating her differently from her co-workers, Ms. Weese and Ms. Gregory, namely,

that they were permitted to access the Internet using the company computer. *Id.* ¶ 12.

---

[12] Defendants do not establish that Plaintiff used a company computer to log in to Facebook during these times.

She also complained that Ms. Bauer rebuked Plaintiff for eating a snack at her desk and did not discipline Ms. Gregory for eating at her desk; Ms. Gregory ate at her desk often. *Id*. Plaintiff was bothered when she spoke to Mr. Miller. *Id*.[13]

### *Disciplinary Action Against Plaintiff For Internet Use*

Defendants assert that on February 12, 2011, Plaintiff was issued a verbal warning to stop using Facebook as her usage was corrupting MVIM's computer with viruses causing her computer to crash; MVIM's IT Department restored it. Def. SOMF [112-2] ¶ 29. Defendants also assert that, on March 18, 2011, Dr. Cohn complained that he stood behind Plaintiff and observed her on Facebook and that she was not to use Facebook during work hours. *Id*.[14] Plaintiff acknowledges that Linda Bauer talked to her about being on Facebook in the office at least less than 10 times prior to February 17, 2012. *Id*. ¶ 32. However, as explained above, Plaintiff generally denies all of this prior discipline, and specifically denies that she was ever caught and/or reprimanded for using Facebook during working hours, *see* Def. Ex. P [115-1]

---

[13] As explained above, Plaintiff's Affidavit claims that Plaintiff also complained to Bauer and Dr. Cohn about this disparate treatment. Pl. Aff. [125-1] ¶ 12. Because this claim directly contradicted clear testimony in Plaintiff's deposition, in which she denied complaining to Bauer, Cohn, or any MVIM doctor about disparate treatment vis-a-vis internet usage or being allowed to eat at her desk, *see* Pl. Dep. [112-3] at 87-88, the Court disregards this portion of the Plaintiff's Affidavit.

[14] The parties dispute whether Plaintiff received a warning for Facebook use on June 9, 2011. *See* Pl. Resp. [124] at 19-20.

at 49. As explained in Section I(A)(2)(d) above, Plaintiff also states that Bauer or others "talked to her" about Facebook, it was in the context of general instructions to the entire staff and not specific reprimands or warnings targeted to Plaintiff.[15]

### Defendants' Failure To Discipline The Alleged Comparators

Prior to February 17, 2012, Ms. Bauer warned all front office staff, including Plaintiff, against Facebook use during work and lunch hours. Def. SOMF [112-2] ¶ 35. Ms. Bauer had only seen two other employees, Ms. Weese and Dion Miller, an African American, on the internet. *Id.* ¶ 38. Bauer talked to all employees about using the internet in group meetings. *Id.*

---

[15] Defendants' Material Fact 30 reads:

On March 18th, Plaintiff was well aware that she was not supposed to be on Facebook because she posted a comment on her Facebook account stating, "at work suppose 2 b working n not on dis computer lol6." . . . . Even after acknowledging that she was not supposed to be doing so, her Facebook log on history shows that she continued to log onto Facebook after March 18th.

Defendants acknowledge that they cannot definitively identify the year in question. *See* Def. SOMF [112-2] at 12 n.5. Plaintiff attacks the assertion on this basis. *See* Pl. Resp. [124] at 19. Because the Court must read all facts in the light most favorable to Plaintiff, the undersigned deems this fact to be disputed. Regardless, the after-the-fact information Defendants proffer in this assertion is immaterial to what decision makers such as Linda Bauer and the named Defendants thought in real time when they decided to terminate Plaintiff because those individuals did not have access to this information. The assertion is therefore not material to the award of summary judgment.

Ms. Gregory has never had a social media account and never logged onto Facebook while at work. *Id.* ¶ 39. She only used the office computer to access Kroger coupons online and to check her emails. *Id.* However, she only used the internet during her lunch break before Ms. Bauer issued the February 16, 2012 complete ban on all internet use for personal purposes. *Id.*; Pl. SOMF [123-2] ¶ 11. Neither Ms. Weese nor Ms. Gregory were ever reprimanded individually for using the internet. *Id.* ¶ 40.

### *Cell Phone Use At Work*

Plaintiff used her cell phone numerous times during work hours to text and make calls. Def. SOMF [112-2] ¶ 28. On April 27, 2012, Plaintiff was issued a verbal warning for using her cell phone during her work hours. *Id.* ¶ 80; *see also* Pl. SOMF [123-2] ¶ 33 (sic) at p. 14. Dr. Tinanoff had walked up and saw Plaintiff looking at pictures on her cell phone. *Id.* Although MVIM allowed employees to make a small number of phone calls, Defendant believed that Plaintiff used her cell phone excessively while she was at work. *Id.* Plaintiff acknowledged that she was not on her lunch hour. *Id.* She states, however, that MVIM never had a telephone policy regarding accessing the internet on personal phones. Pl. SOMF [123-2] ¶ 10. She also disputes that she was actually looking at Facebook or another internet site; she states that, instead, she was receiving a phone call from her daughter and this caused her

daughter's photograph to be displayed on the screen at the moment Dr. Tinanoff observed her. Pl. Dep. [112-3] at 69-71. She does not otherwise deny the incident or that she was warned by Tinanoff.

### *Bauer's Alleged Battery of Plaintiff*

On February 17, 2012, Ms. Bauer walked up behind Plaintiff and saw her on Facebook after she had told her not to do so for what Defendants characterize as the "umpteenth" time. Def. SOMF [112-2] ¶ 41.[16] Bauer touched Plaintiff with a stack of papers, but the two sides dispute whether Bauer merely tapped Plaintiff or forcefully struck her. *See* Pl. Resp. [124] ¶¶ 42-43; Pl. SOMF [123-2] ¶¶ 14, 15, 18. The two sides also dispute the tone in which Bauer spoke to Plaintiff. *See id*. Regardless, Plaintiff did not see Bauer approach her before Bauer made contact. Def. SOMF [112-2] ¶ 42.

Plaintiff left the office, called 911 and returned with a Sandy Springs police officer. *Id*. ¶ 47; *see also* Pl. SOMF [123-2] ¶ 17. Plaintiff and the officer went into Bauer's office with Pat Wright as a witness. *Id*. Plaintiff recounted what happened in

---

[16] As discussed several times above, Defendants assert that Plaintiff had been caught improperly using the internet and specifically reprimanded on several occasions prior to February 17, 2012. Plaintiff, however, disputes that these incidents occurred. The Court is obliged to take Plaintiff's version of these disputed facts as true. However, it is undisputed that Bauer on several occasions generally instructed the office staff, in remarks not specifically targeted at Plaintiff, not to use the internet for personal purposes, except during lunch hour. *See* Def. Ex. P [115-1] at 49.

front of the officer. *Id*. ¶ 48. Plaintiff asked for an apology but cannot recall what other statements were made in the officer's presence. *Id*. ¶ 49. Bauer apologized and Plaintiff accepted Bauer's apology. *Id.* The officer left the MVIM offices. *Id.* ¶ 50. No charges were ever brought and, with the exception of the 911 Event Transcript Report, no other police report was ever generated of the incident. Def. SOMF [112-2] ¶ 50. Plaintiff did not allege race discrimination at the time and the Event Transcript Report does not make refer to any such allegations. *Id.*

Plaintiff then went on vacation, which Bauer had approved, and returned to the office on February 23, 2012. *Id*. ¶ 51.

Ms. Bauer told the physicians about the incident. *Id.* ¶ 52; *see also* Pl. SOMF [123-2] ¶ 21. Plaintiff approached Dr. Tinanoff to report the incident. *Id.*; *see also* Pl. SOMF [123-2] ¶ 21. Dr. Tinanoff referred her to Dr. Cohn who was in charge of personnel at the time and Plaintiff told him what happened. *Id.*; *see also* Pl. SOMF [123-2] ¶ 21. Plaintiff alleges that Dr. Cohn "was more focused on the fact that Plaintiff had called the police than addressing her concerns with her work environment." Pl. SOMF [123-1] ¶ 21.

The physicians investigated the incident and reprimanded Bauer on February 22, 2012 for her handling of the incident. Def. SOMF [112-2] ¶ 53. Bauer was counseled, told to formally apologize to Plaintiff, asked not to conduct further

disciplinary action in her office, told that any employee's disciplinary action must be conducted with the partners prior to being implemented, and told to take an anger management workshop. *Id.* The physicians determined that these recommendations were appropriate after due consideration to the facts and circumstances and based on their belief that Ms. Bauer did not intend to harm Plaintiff and her actions did not amount to physical violence. *Id.* Ms. Bauer complied with all the recommendations, but the parties dispute whether Bauer apologized again to Plaintiff. *Id.*

After the incident, Plaintiff felt stressed. Pl. SOMF [123-2] ¶ 19. She believed that she could get hit again and believed and feared that she could lose her job. *Id.*

Plaintiff saw Bauer twice after the February 17, 2012 incident. Def. SOMF [112-2] ¶ 58. Bauer documented matters concerning Plaintiff between February 17, 2012 and April 3, 2012. *Id.* ¶ 59. On February 27, 2012, Plaintiff refused to talk to Bauer about payment for leaving early on February 17, 2012. *Id.* ¶ 60.

Plaintiff got along with Bauer until the February 17 incident. *Id.* ¶ 101. Bauer had earlier many times ardently advocated financial benefits for Plaintiff. *Id.* ¶ 102.

### *Eating At Work*

On March 8, 2012, Bauer saw Plaintiff eating at her desk and asked her to please take it elsewhere as she should not be eating at the front desk. *Id.* ¶ 61. Although there was no written practice policy against eating at the desk, front desk

employees were not allowed to eat at their desk while the office was open for business between 8:00 a.m. and 5:00 p.m., but the office was closed during lunch. *Id. ¶* 62. Plaintiff did not regularly eat at her desk and only did so on one single occasion after which Ms. Bauer told her not to do so. Def. SOMF [112-2] *¶* 63. No disciplinary action was taken against Plaintiff for eating at her desk on this single occasion. *Id.*

Mr. Miller testified that in one of his casual conversations with Plaintiff, Plaintiff told him that Ms. Bauer had refused to allow her to eat at her desk whereas other employees were allowed to do so. *Id.* ¶ 66. Mr. Miller and Plaintiff were good friends and they sometimes engaged in casual conversation about work and Mr. Miller did not perceive any of the casual statements made by Plaintiff to rise to the level of a complaint. *Id.* One such statement was the eating at the desk issue. *Id.* Accordingly, Mr. Miller did not report or mention Plaintiffs statement about the eating at the desk issue to Defendants or any other employee. *Id.*

Mr. Miller was never Plaintiff's supervisor. *Id.* ¶ 67. Ms. Torrance was not Plaintiff's supervisor at the time Plaintiff allegedly mentioned whether other employees were allowed to eat at their desks while she was not to Torrance. Def. SOMF [112-2] ¶ 67.

### EEOC Complaints

The Equal Employment Opportunity Commission ("EEOC") issued a Notice of Charge of Discrimination dated March 29, 2012 against MVIM. *Id.* ¶ 69; *see also* Pl. SOMF [123-2] ¶ 22. A subsequent Charge of Discrimination was issued by the EEOC on April 10, 2012 which contains allegations of race discrimination and retaliation against MVIM under Title VII. *Id.*; *see also* Pl. SOMF [123-2] ¶ 22 (sic) at p. 10-11. Plaintiff also alleged hostile work environment. Pl. SOMF [123-2] ¶ 22 (sic) at p. 10-11.

### Bauer's Reaction To Plaintiff's EEOC Complaint

Plaintiff testified that Ms. Bauer's actions towards her changed after the EEOC filing. Def. SOMF [112-2] ¶ 96.

Upon receipt of the March 29, 2012 Notice, Ms. Bauer was flabbergasted and called Plaintiff into her office with Ms. Wright present to ask about the Charge. *Id.* ¶ 71. Ms. Bauer asked Plaintiff why she was calling her a racist. *Id.*; *see also* Pl. SOMF [123-2] ¶ 21 (at p. 10).

There was another meeting between Ms. Bauer and Plaintiff wherein Plaintiff told Ms. Bauer that her reasons for filing the EEOC Charge were because she felt that she was treated unfairly on the day of the incident by being hit on the job for internet use; because other employees were not counseled or disciplined for internet use;

44

because she was overwhelmed with having to do other people's work; and because she did not get a raise. *Id.* ¶ 73; *see also* Pl. SOMF [123-2] ¶ 21 (at p. 10). During this meeting, Ms. Bauer discussed Plaintiff's repeated tardiness to work. *Id.*

The parties dispute what Bauer said to Plaintiff during the meetings, both in terms of word choice and substance. Plaintiff alleges that Bauer told her *she would terminate Plaintiff for filing the EEOC charge*, while Defendants deny that. *See* Pl. SOMF [123-2] ¶¶ 22, 23 (sic) at p. 11; *see also* Def. Resp. [138] at 24-25, 27.

During their limited interactions, Plaintiff refused to take direction from Ms. Bauer. Def. SOMF [112-2] ¶ 82.

On May 1 and May 18, 2012, Ms. Bauer responded to the EEOC Notice of Charge requesting a dismissal on the grounds that the practice does not employ more than 14 employees under Title VII. *Id.* ¶ 83. On May 21, 2012, the EEOC issued a Dismissal based on inapplicability of Title VII. *Id.*; *see also* Pl. SOMF [123-2] ¶ 23 at p. 11. Bauer received the dismissal on May 24, 2012. Pl. SOMF [123-2] ¶ 23 (sic) at p. 11.

### *Plaintiff's Termination*

Plaintiff was terminated on May 30, 2012. Def. SOMF [112-2] ¶ 84. The separation notice lists "insubordination" as a reason. Pl. SOMF [123-2] ¶ 24 (sic) at p. 11. On May 30, Plaintiff stated to Ms. Bauer: "No, you're firing me because the

case is dismissed," and Ms. Bauer responded, "Yeah, you're right." Pl. SOMF [123-2] ¶ 38 (sic) at p. 16.

On August 7, 2012, Ms. Bauer testified that Plaintiff was not compliant with MVIM policies, that Plaintiff violated internet policies, and the physicians told her to terminate Plaintiff. Pl. SOMF [123-2] ¶ 38 (sic) at p. 16.

Plaintiff cannot identify a single racist word, slur or comment by Ms. Bauer at the time of the incident, after the incident, at the time of her termination or at any other time. Def. SOMF [112-2] ¶ 90.

### Plaintiff's Emotional Distress

Plaintiff alleges that because of the incident, she suffered "garden variety" emotional distress, specifically, hurt feelings, hurt back, and stress and fear of her job; she did not seek medical treatment. *Id.* ¶ 103.

## III.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes*

*v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to

be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *See Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *See id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

B.   COUNT   ONE:   WRONGFUL   TERMINATION   (RACE DISCRIMINATION)

Plaintiff in Count I asserts a claim for racial discrimination in violation of Section 1981. The Supreme Court has held that Section 1981 encompasses claims of race discrimination. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008); *see also Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009). Section 1981 does not have the administrative exhaustion requirements as found in Title VII. *See Mathis v. Leggett & Platt*, 263 F. App'x 9, 12 (11th Cir. 2008). Otherwise, in cases in which a Plaintiff has asserted a claim under Section 1981 for employment discrimination on the grounds of race, the elements required to establish a claim under Section 1981 mirror those required under Title VII. *See Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994) (*citing Patterson v. McClean Credit Union*, 491 U.S. 164 (1989)); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991). The undersigned will therefore analyze Plaintiff's claims under Title VII.

1.   Legal Standard

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must

prove that the defendant acted with discriminatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-981 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984).

### a.   Direct Evidence

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *See Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination, *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of an

employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998).

b.     Circumstantial Evidence

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley*, 907 F.2d at 1081-82. Because direct evidence of discrimination is seldom available, Title VII plaintiffs must typically rely on circumstantial evidence to prove discriminatory intent using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *see also Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *See Jones*, 137 F.3d at 1310-1311; *Holifield*, 115 F.3d at 1562; *Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A *prima facie* case along with sufficient evidence to reject the employer's explanation is generally all that is needed to permit a finding of intentional discrimination. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529. However, summary judgment for the employer may still be appropriate in some circumstances, even if plaintiff produced evidence refuting the employer's proffered explanation, if the record "conclusively revealed some other, nondiscriminatory reason" motivated the decision. *Alvarez v. Royal Atl., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citing *Reeves*, 530 U.S. at 148).

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the "framework is only a tool." *Nix*, 738 F.2d at 1184. The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.* (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action by his employer; (3) she was qualified to do the job in question, and (4) her employer treated similarly-situated employees outside his protected classification (*i.e.*, those of a different sex or race) more favorably than it treated him. *See McDonnell Douglas*, 411

U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

    2.  Plaintiff's Attempt To State A *Prima Facie* Case

It is either clearly established in the record or at least not disputed by Defendants that Plaintiff meets the first three elements of an unlawful race discrimination claim. *See* Def. SOMF [112-2] ¶ 1 (Plaintiff is African-American, and is therefore a member of a protected class); Def. SOMF [112-2] ¶ 84 (Plaintiff was terminated, and therefore suffered a materially adverse employment action).[17]

The dispute instead focuses on the fourth element, that is, whether Plaintiff has adduced evidence of discriminatory intent. Plaintiff does not produce any direct evidence of discrimination. Rather, she relies on circumstantial evidence to attempt show at least a *prima facie* case of discriminatory intent pursuant to the *McDonnell-Douglas* framework.

Specifically, Plaintiff focuses on the claim that she was terminated at least in part for improper internet and social media usage. According to Plaintiff, other similarly-situated employees outside of her protected class, namely, Weese and Gregory, improperly used company computers for personal internet access and were

---

[17] Defendant does not contest that Plaintiff was qualified for her position. Moreover, the facts show that she was employed at MVIM for over four years, Def. SOMF [112-2] ¶ 1, allowing the inference that MVIM considered her qualified.

not terminated for doing so. Thus, Plaintiff argues, this disparate treatment establishes a *prima facie* showing that she was really terminated because of her race.

"When evaluating an allegation of disparate treatment," courts "require that a comparator be similarly-situated to the plaintiff in all relevant respects." *Stone & Webster Constr. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (internal quotations and citation omitted). Indeed, a comparator "must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). "Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not 'similarly situated' for purposes of establishing a prima facie case." *Brown v. Jacobs Eng'g, Inc.*, 401 F. App'x 478, 480 (11th Cir. 2010). For example, in *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316-1317 (11th Cir. 2003), the Eleventh Circuit affirmed a grant of summary judgment despite evidence that the African-American plaintiff was disciplined more harshly than a Caucasian co-worker who performed the same job, and who committed similar infractions. The court found that plaintiff failed to establish that the two employees were similarly-situated in all relevant respects because, despite similarity in their misconduct, the comparator's overall record was better. *See id.*

Courts consider whether the proffered comparator had the same supervisor, *see Morris v. Potter*, 251 F. App'x 667, 668-669 (11th Cir. 2007), held a similar job at a similar level of responsibility, and performed similar work. *See Simionescu v. Bd. of Tr. of the Univ. of Ala.*, 482 F. App'x 428, 430-431 (11th Cir. 2012) (two university faculty members were not similarly-situated because one was not tenure-track, while plaintiff was, and second faculty member taught in a different department than did plaintiff). Courts also consider whether the plaintiff and the proffered comparator were employed for similar periods and whether they had similar records of performance. *See Roy v. Broward Sheriff's Office*, 160 F. App'x 873, 876 (11th Cir. 873) (comparator not similarly-situated because comparator had been with department for sixteen years, while plaintiff had less than 18 months' service); *Jarvis v. Siemens Med. Solutions USA, Inc.*, 460 F. App'x 851, 857-858 (11th Cir. 2012) (minority plaintiff failed to show that Caucasian coworker qualified as similarly-situated where record showed plaintiff had several significant employment performance deficiencies not seen in Caucasian employee's record).

Defendants argue that Plaintiff's comparison to Weese and Gregory is insufficient under these standards to establish an inference of discriminatory intent. Based on the facts adduced in the record, the undersigned agrees.

The alleged misconduct that Defendants claim resulted in Plaintiff's termination is not sufficiently similar to the alleged misconduct of Weese and Gregory. Excessive and/or improper use of the internet was not the only ostensible reason for Plaintiff's termination. To the contrary, the reason stated on Plaintiff's separation notice was not internet usage at all, but rather was "insubordination," referring at least in part to Defendants' perception that Plaintiff refused to take direction from Defendant Bauer after the February 17 confrontation. *See* Tinanoff Aff. [113-1] ¶¶ 15-18. Indeed, while the parties dispute exactly what happened and who is to blame, a serious confrontation occurred between Bauer and Plaintiff in February 2012 that resulted in police intervention and apparent ensuing hostility. Moreover, while the parties dispute who deserves more blame for their actions that day, Plaintiff does not specifically dispute Defendants' assertion that after this incident "Plaintiff refused to take direction from Ms. Bauer." *See* Pl. Resp. SOMF [124] ¶ 82 (offering citations in support of Plaintiff's version of the events of February 17 but not responding to Defendants' asserted fact that, after this event, "Plaintiff refused to take direction from Ms. Bauer."). The alleged internet use by Weese and Gregory did not result in these dramatic events, allegations of "insubordination," or an ongoing refusal to take direction from a direct supervisor.

57

Defendants also have stated that the MVIM physicians considered Plaintiff's poor performance and history of tardiness in deciding to terminate her. Indeed, it is not disputed that Plaintiff exhibited a period of poor performance during her employment that resulted in her being placed on probation for a period, *see* Pl. Dep. [119-1] at 50-52; Pl. Resp. SOMF [124] ¶ 18, and that Plaintiff had difficulties with tardiness that necessitated a change to her schedule, Def. SOMF [112-2] ¶¶ 12, 81. There is no evidence that Weese and Gregory were believed to have engaged in poor performance or tardiness.

Also, as to Gregory, Plaintiff does not properly cite any evidence that Bauer or any of the physician-Defendants at MVIM were aware of Gregory's alleged internet misconduct. The undisputed facts instead indicate that Ms. Gregory has never had a social media account and never logged onto Facebook while at work. Def. SOMF [112-2] ¶ 39. Gregory only used the office computer to access Kroger coupons online and to check her emails. *Id.* She only used the internet during her lunch break prior to the February 16, 2012 complete ban on all internet use for personal purposes. *Id.*; Pl. SOMF [123-2] ¶ 11. While Gregory used the internet during working hours after MVIM prohibited such usage on February 17, 2012, Pl. SOMF [123-2] ¶ 11; Def. SOMF [112-2] ¶ 24, Plaintiff does not establish that Bauer or any other relevant supervisor at MVIM was aware of this apparent misconduct at the time. Gregory's

internet usage – absent evidence that the same decision-makers at MVIM who terminated Plaintiff knew of and deliberately failed to discipline Gregory – has no bearing on Defendants' reasons for terminating Plaintiff.

Bauer testified that she observed Weese on the internet, but Plaintiff did not establish whether this occurred during work hours, whether it was a one-time or repeat occurrence, whether it happened after Weese received instructions against  internet use, or what specifically Bauer saw Weese doing on the internet. *See* Def. Ex. G [113-6] at 38. Without more facts, this incident cannot be meaningfully compared to the situation involving Plaintiff.

Finally, Weese and Gregory are distinguishable in terms of their position and seniority at the company. Gregory was a long-standing employee with 10-15 years service, and Weese was a supervisor. Def. SOMF [112-2] ¶¶ 8, 11. These factors alone could explain why Weese and Gregory might face different disciplinary decisions than Plaintiff. *See Washington v. United Parcel Service, Inc.*, – F. App'x –, 2014 WL 2178981, *3 (11th Cir. 2014) (alleged comparators were not similarly-situated to plaintiff where they were not "at the same level in the organization" as plaintiff); *Roy*, 160 F. App'x at 876. At a minimum, these factors combine with all of the other issues discussed above to show why the failure to discipline Weese and Gregory for their alleged internet use fails to show an intent to discriminate against Plaintiff on the basis

of race.[18] The undersigned therefore **RECOMMENDS** that Defendants' Motion [112]

be **GRANTED** as to Count One.[19]

C.    COUNT TWO: HOSTILE WORK ENVIRONMENT

Count Two alleges Hostile Work Environment on the basis of race. In order to

establish a *prima facie* case for a Title VII claim against an employer for a hostile

work environment based on harassment, a plaintiff must show that: (1) she belongs

to a protected group; (2) she was subjected to unwelcome harassment; (3) the

harassment was based on race; (4) the harassment was sufficiently severe or pervasive

to alter the terms and conditions of employment; and (5) there is a basis for holding

the employer liable for the harassment either directly or indirectly. *See Miller v.*

*Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Cross v. Ala.*, 49

F.3d 1490, 1504 (11th Cir. 1995); *Henson v. City of Dundee*, 682 F.2d 897, 903-905

_____

[18] Notably, Bauer also caught Dion Miller, who like Plaintiff is African American, using the internet in the office. *See* Def. SOMF ¶ 38 (citing Def. Ex. G (Bauer Dep.) [113-6] at 37-38). There is no indication that Miller was terminated or disciplined in any way despite his race.

[19] As discussed in more detail in Section D, below, in connection with Plaintiff's retaliation claim, Defendants articulate legitimate, non-discriminatory and non-retaliatory reasons for terminating Plaintiff. But Plaintiff has established triable issues of fact as to whether those reasons were pretextual, that is, whether those were the true reasons why Plaintiff was terminated. There remains no evidence that the real reason was Plaintiff's race. Nevertheless, the undersigned  recommends granting summary judgment on Count One on the specific ground that Plaintiff fails to establish a *prima facie* case of discrimination and not for failure to prove pretext.

(11th Cir. 1982); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742 (1998).

Plaintiff alleges harassment on the basis of her protected racial class. Def. SOMF [112-2] ¶ 1; Pl. SOMF [123-1] ¶ 1. Plaintiff alleges that she was harassed, principally by Bauer, beginning in about February 17, 2012 when Bauer struck Plaintiff. *See* Def. Brf. [112-1] at 32; Pl. Resp. [123-1] at 25. From that day through May 30, 2012, the following acts of harassment occurred:

Bauer battered Plaintiff on February 17, 2012 by striking her on the back with a stack of files/papers. Pl. SOMF [123-2] ¶¶ 14, 18. Bauer also spoke sharply to Plaintiff during the incident and ordered Plaintiff out of her office. *Id.* ¶ 21. Plaintiff had limited interactions with Bauer between her return to work and her termination. Def. SOMF [112-2] ¶ 58. After the incident, Plaintiff felt stressed, fearing that Bauer would hit her again or that she might lose her job. Pl. SOMF [123-2] ¶ 19.

Plaintiff filed a charge of discrimination with the EEOC on March 29, 2012 against MVIM. Def. SOMF [112-2] ¶ 69; Pl. SOMF [123-2] ¶ 22. Bauer's actions towards Plaintiff escalated after this time. Def. SOMF [112-2] ¶ 96. Plaintiff alleges that Bauer told her she would terminate Plaintiff for having filed the charge. *See* Pl. SOMF [123-2] ¶¶ 22, 23 (sic) at p. 11. Bauer used profanity when she met with

Plaintiff. *Id*.; *see also* Pl. Dep. [112-3] at 103; 121-123. Bauer issued Plaintiff's termination on May 30, 2012. Def. SOMF [112-2] ¶ 84.

1.   Harassment Must Be Based On Race

As explained in detail in Section D below, the undersigned finds that Bauer's hostile reaction to the filing of the EEOC complaint – and in particular her threat to terminate Plaintiff – establish triable issues of fact and defeat summary judgment as to Plaintiff's claim of retaliation. Bauer's striking of Plaintiff also supports various tort claims. However, for these acts to also support a hostile work environment claim under § 1981, at least as alleged in the Complaint, Plaintiff must show evidence that the conduct was specifically directed at Plaintiff *because of her race*. Plaintiff fails to show that, and on that basis alone, Count Two should be dismissed.

Plaintiff adduces no racial epithets, comments, or other evidence suggesting that Bauer's actions were racially-motivated. *See* Def. SOMF [112-2] ¶ 90. Indeed, Plaintiff does not even argue that Bauer was motivated by Plaintiff's race. Plaintiff's only argument on the issue of Bauer's motivation for her allegedly harassing conduct consists of a single sentence: "The harassment was motivated *by Plaintiff's complaint* that she was discriminated against." Pl. Resp. [123-1] at 26 (emphasis added).

At the threshold, this argument cannot include Bauer's battery of Plaintiff on February 17, 2012 because that conduct pre-dated Plaintiff's complaints of discrimination. More broadly, however, *retaliation* against an employee for complaining about discrimination is not itself evidence of racial discrimination. *See, generally*, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 460 (2008) ("Retaliation is not discrimination based on race. When an individual is subjected to reprisal because he has complained about racial discrimination, the injury he suffers is not on account of his race; rather, it is the result of his *conduct*.") (emphasis in original). Thus, harassment motivated by "Plaintiff's complaint" does not establish hostile work environment on the grounds of race.

To the extent Plaintiff argues that Count Two alleges a retaliatory hostile work environment, that is, a hostile work environment based not specifically on her race but rather on her protected activity, such an argument improperly expands the claim. Count Two clearly alleges that "Defendants' actions as articulated in paragraphs 1 through 38 above constituted a hostile work environment, in that they were unwelcome, offensive, and abusive, *and they were motivated by Plaintiff's race*." Am. Cmplt. [64] ¶ 43. Count Two therefore does not allege retaliatory hostile work environment, and Plaintiff cannot survive summary judgment as to this Count by conflating her evidence of retaliation with her claims of race-based discrimination.

63

Thus, because Plaintiff shows no evidence that Bauer's harassment was motivated *by race*, Plaintiff's claims of hostile work environment under Count Two fail.

    2.     Severe and Pervasive

To demonstrate the fourth element of a *prima facie* case of a hostile work environment, a plaintiff must also show that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Courts must consider the "totality of the circumstances" in determining whether a hostile environment is severe or pervasive enough to be actionable under Title VII; it must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23; *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). Other relevant factors include whether the offensive conduct is physically-intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *See Harris*, 510 U.S. at 23.

As the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). In evaluating whether a reasonable

person would find conduct to be sufficiently severe or pervasive, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*) ("courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.").

The material facts do not indicate that the harassment Plaintiff faced was sufficiently severe and pervasive to fulfill this element. While the parties dispute the severity of Bauer's act of battery, in which she struck Plaintiff with medical files, this was as a solitary and isolated act, and there is no evidence that Plaintiff otherwise suffered any physical harm or threats. And mitigating any long-term pervasive effect of this single incident, the evidence also shows that Bauer was disciplined by MVIM, reprimanded, sent to anger management classes, and that she apologized at least once to Plaintiff. Def. SOMF [112-2] ¶¶ 52-53.

Over a month later, immediately after Plaintiff filed her EEOC claim, Bauer threatened to fire Plaintiff and used foul language in doing so. Pl. SOMF [123-2] ¶ 22. But the undisputed facts otherwise show limited interactions between Bauer and Plaintiff up until the date of Plaintiff's termination. Def. SOMF [112-2] ¶ 82. Again, these acts were inappropriate and support a variety of claims, including Retaliation under § 1981, and (in the case of the February 17 incident) Assault and Battery. But these limited interactions do not rise to the level of being so severe and pervasive as to alter the conditions of Plaintiff's employment. Thus, the undersigned **RECOMMENDS** that Defendants' Motion [112] be **GRANTED** as to Count Two.

D.      COUNT THREE: RETALIATION

Plaintiff in Count Three asserts a claim for Retaliation in violation of Section 1981. Plaintiff specifically alleges that Defendants retaliated against her for filing a police report related to the February 17, 2012 incident, and for filing her EEOC charge by firing her from her job. *See* Am. Cmplt. [64] ¶ 46.

To establish this claim, Plaintiff must show that: (1) she engaged in a protected activity under the statute; (2) she suffered an adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *See Ch. 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012); *see also Howard v. Walgreen*

66

*Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010); *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008).

The Eleventh Circuit held in *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998), that, as used in the context of a claim of retaliation under Title VII, adverse employment actions are not limited strictly to ultimate employment decisions such as a termination or a failure to promote. *See id.* at 1456 ("Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions."). In *Wideman*, the court found that a series of incidents involving reprimands and other negative treatment of an employee who had filed an EEOC charge could, when taken together, constitute adverse employment actions for the purposes of presenting a *prima facie* case of retaliation under Title VII. *Id.* Nevertheless, although actions falling short of ultimate decisions may still constitute adverse employment actions under Title VII, "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." *Wideman*, 141 at 1456; *see also Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Similarly, the Supreme Court has held that the anti-retaliation provision of Title VII covers a broader scope of conduct than does the anti-discrimination provision. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("[W]e conclude

67

that Title VII's substantive provision and its anti-retaliation provision are not coterminous. The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."). This "formulation requires a retaliation plaintiff to show that the challenged action might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) (internal quotations and citation omitted). Nevertheless, the Supreme Court reiterated the requirement that the adverse action cannot be merely a trivial annoyance, but must instead be significant to qualify as actionable unlawful retaliation under Title VII:

> The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm . . . . In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination . . . . We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-68 (internal quotations and citations omitted).

68

1.     Protected Activity / Adverse Action

As an initial matter, the Court notes that Plaintiff's alleged police report following Bauer's striking of Plaintiff does not itself constitute "protected activity" within the meaning of § 1981. Plaintiff adduces no evidence that her report to the Sandy Springs Police Department referenced race discrimination. Rather, the "Event Transcript Report," which is the only evidence of the crimes reported by Plaintiff, refers only to "assault or battery." Def. SOMF [112-2] ¶ 50; Cohn Dep. [119-4] Ex. 3. *See Rossi v. Fulton Cnty., Ga.*, Civil Action File No. 1:10-CV-4254-RWS-AJB, 2013 WL 1213268, at *23 n.17 (finding that police report that lacked any mention of race did not provide evidence of protected activity). Plaintiff also makes no legal argument that a mention of "race discrimination" in a police complaint – even if she had made such a reference – could constitute "protected activity" under § 1981 or Title VII given that race discrimination is generally outside the jurisdiction of local police departments to investigate and enforce.

Plaintiff, however, obviously engaged in protected activity in the form of the complaint of discrimination that she lodged with the EEOC, which resulted in the EEOC's Notice of Charge of Discrimination to MVIM dated March 29, 2012. Def. SOMF [112-2] ¶ 69. That charge specifically alleges race discrimination. *See* Def. Ex. R [115-3] at 1. A subsequent charge of discrimination – essentially a revision or

addendum to the March 29 document – was filed on April 10, 2012 and lists both race and retaliation as the bases for discrimination. *See id*. at 2. Both of these actions clearly constitute protected activity, and Defendants do not dispute this. It is also not disputed that Plaintiff suffered an adverse employment action subsequent to her protected activity in the form of her May 30, 2012 termination. Def. SOMF [112-2] ¶ 84; *see also* Pl. Resp. [123-1] at 30.

2.      Causal Connection

The parties hotly dispute whether evidence exists linking Defendants' receipt of the EEOC charges in March and April 2012 with Plaintiff's termination on May 30, 2012.

To establish  causation, Plaintiff was traditionally required to show that the relevant decision maker knew of Plaintiff's protected conduct, and that the protected activity and the adverse action "were not wholly unrelated." *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (internal citation and quotations omitted). The Supreme Court, however, recently ruled that "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . ." *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*.

70

Defendant argues that the approximately eight weeks between the initial receipt of the EEOC charges and Plaintiff's termination is too long of a gap to infer causation, citing the Eleventh Circuit's unpublished decision in *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229-230 (11th Cir. 2011). *See* Def. Brf. [112-1] at 48. This timing is at best very close to permitting an inference of causation, however, as Plaintiff points to a published Eleventh Circuit case that found a gap of seven weeks to be sufficient to in that regard. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1332, 1337 (11th Cir. 1999); *see also* Pl. Resp. [123-1] at 31. Moreover, Defendants' own testimony establishes that "[t]he termination would have been carried out earlier than May 30, 2012, but Plaintiff was on vacation." Tinanoff Decl. [113-1] ¶ 19.

It is unnecessary to determine whether the borderline temporal gap here is sufficiently short to allow an inference of causation because there is significantly more evidence of causation in the record to defeat summary judgment. According to Plaintiff, Bauer blatantly and directly threatened Plaintiff after Plaintiff filed her EEOC complaint, "telling her that she would fire her because she filed the EEOC charges." *See* Pl. SOMF [123-2] ¶ 22; Pl. Dep. [112-4] at 118-121. Plaintiff testified further that Bauer told her that "my ass was going to be fired once the case was

dismissed." Pl. Dep. [112-4] at 121:17-18.[20]  Bauer received the EEOC's dismissal of Plaintiff's claim on May 21, 2012. Def. SOMF [112-2] ¶ 83. Plaintiff was, in fact, fired *nine days later*, just as Bauer said would happen. Plaintiff testified that she asked Bauer to confirm why she was being fired, saying, "It's because the case is dismissed; right?" to which Bauer replied, "Yeah, you're right." Pl. Dep. [112-4] 136:10-11.

At a minimum, that Bauer told Plaintiff just days after she filed the EEOC complaint that Plaintiff would be fired as soon as the complaint was dismissed, and that Plaintiff was in fact fired nine days after the complaint was dismissed, defeats any argument Defendants make about the eight-week temporal gap between the protected activity and adverse action. This evidence, if credited by the jury, would allow the conclusion that the termination decision was made significantly closer in time to the filing of the EEOC complaint, and that Defendants deliberately chose to wait until eight weeks later because of the pendency of the EEOC action. Indeed, Defendants themselves state that the decision to fire Plaintiff was made in "March and April 2012," Tinanoff Decl. [113-1] ¶ 16, and/or "early May," Def. SOMF [112-2] ¶ 89, therefore necessarily occurring at least in major part closely after receipt of the March

---

[20] The EEOC case was dismissed on jurisdictional grounds, not on the merits, because MVIM did not have the requisite number of employees to trigger regulation under Title VII.

30, 2012 Notice of Charge of Discrimination. This very close temporal proximity itself is a sufficient basis to establish causation.

Moreover, Bauer's statements to Plaintiff allow more than an inference based on temporal proximity. According to Plaintiff, Bauer came right out and directly told Plaintiff that she would be fired because of the filing of the complaint. This statement is direct evidence of causation. Defendants' argument in response appears to be that regardless of what Bauer told Plaintiff, those statements do not reflect the intent of the MVIM physician-partners who were the ones who decided to fire Plaintiff. *See* Def. Reply [114] at 26-27. Specifically, the physicians offer testimony that their decision to terminate Plaintiff was based on "her lack of improvement, [and] insubordination to Ms. Bauer." Tinanoff Decl. [113-1] ¶ 16.

This and other similar testimony may very well be credited by the jury, but it does not entitle Defendant to summary judgment. First, at most this statement creates a factual dispute that must be resolved by a jury because it directly contradicts what Plaintiff's own supervisor, Bauer, stated as the reason for Plaintiff's dismissal. While Defendants claim that Bauer did not make the termination decision, a jury could infer that her statement at least reflected knowledge of if not actual involvement in the termination discussions. Defendants do not deny that Bauer was at least consulted as part of these discussions relating to a major personnel decision in this very small

73

company, and the evidence, reviewed in the light most favorably to Plaintiff, suggests that she was. *See* Tinanoff Decl. [113-1] ¶ 15 ("Ms. Bauer brought these issues [leading to Plaintiff's termination] to my attention"); *See also,* Def. SOMF ¶ 20 (describing how the physicians on an earlier occasion discussed the possibility of terminating Plaintiff with Bauer and deferred to Bauer's recommendation not to do so at that time). Indeed, Bauer clearly stated that Plaintiff would be terminated immediately after the EEOC proceeding ended, which is exactly what happened. The jury could infer that this prescience was more than a lucky guess, and instead reflected a role in the discussions.

Second, relatedly, Bauer's intent to retaliate against Plaintiff cannot be separated as a matter of law from the termination decision. Even if the ultimate termination decision was made by others above Bauer, that is, Dr. Tinanoff and the other physicians, that decision was made in substantial part based on the information *Bauer provided*. *See* Tinanoff Decl. [113-1] ¶ 15. For example, while Plaintiff was terminated for supposed insubordination to Bauer, it was Bauer herself who reported that insubordination to the physicians *Id.* The jury could find that Bauer's intent to retaliate heavily influenced the termination on this basis alone.

Thus, on numerous bases, including the close temporal proximity between the protected activity and decision to terminate Plaintiff, as well as Bauer's direct statement that Plaintiff would be terminated because of her protected activity, Plaintiff has adduced viable evidence upon which a jury could find that she was terminated because of her EEOC complaint. The undersigned therefore finds that Plaintiff has established a *prima facie* case of retaliation.

### 3.     Legitimate, Non-Retaliatory Reason

That Plaintiff shows a *prima facie* case of retaliation does not end the Court's inquiry. Rather, this finding simply shifts the burden to Defendants to establish a legitimate, non-retaliatory reason for Plaintiff's dismissal. Defendants argue that Plaintiff had an extended history of poor performance, violation of the MVIM internet policy, tardiness, improper cell phone use and insubordination. *See* Def. Brf. [112-1] at 27-28. Defendants adduce evidence that the physician Defendants had previously decided to terminate Plaintiff for poor performance prior to 2012, although at Bauer's suggestion they decided to give Plaintiff time to improve. Def. SOMF [112-2] ¶ 17. Defendant's facts state that Defendant Cohn complained about Plaintiff's improper accessing of Facebook in February 2011. *Id*. ¶ 29. Plaintiff was also warned about excessive cell phone usage in April 2012 and counseled about repeatedly arriving late

to work that month as well. *Id. ¶¶* 80-81. These are legitimate, non-retaliatory reasons for Plaintiff's discipline.

4.     Pretext

Plaintiff can defeat Defendants' showing of legitimate, non-retaliatory reasons for their actions by pointing to evidence of pretext. A plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously-produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *See Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804. However, because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination or retaliation, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).

The Court finds that Bauer's statement to Plaintiff "telling her that she would fire her because she filed the EEOC charges," Pl. SOMF [123-2] ¶ 22, and that Plaintiff's "ass was going to be fired once the case was dismissed," Pl. Dep. [112-4] at 121:17-18, constitutes evidence of pretext. A jury could find from these direct statements – and from the evidence that Defendant MVIM decided to fire Plaintiff so close in time after her protected activity – that Defendants fired Plaintiff because of her protected activity, regardless of what ostensible reasons were given. Indeed, this is the rare case that presents actual direct evidence of pretext in the form of the Plaintiff's own supervisor announcing that the real reason for her termination was because Plaintiff filed an EEOC complaint. For all the reasons discussed above as to evidence of causality, pretext can be found based on this evidence alone.

Moreover, although it is less strong, Plaintiff also points to some circumstantial evidence of pretext. First, Plaintiff points to some shifts in Defendants' explanations for her termination. Specifically, while Plaintiff's termination paperwork cited the reasons for her dismissal as "insubordination," *see* Bauer Dep. [119-6] Ex. 5, Bauer verbally told Plaintiff that she was being terminated for inappropriate Facebook use, *see* Pl. Dep. [112-4] 136:8-9. Defendants have also after-the-fact cited Plaintiff's "repeated poor performance" and other failings as a reason for termination. Tinanoff Decl. [113-1] ¶ 16. Courts have recognized shifting justifications for termination as

evidence of pretext. *See Vaughn v. Vilsack*, 715 F.3d 1001, 1008 (7th Cir. 2013). The Court agrees that the difference between the reason provided on paper (insubordination) with the reason provided orally (Facebook use), followed by the additional reasons discussed in retrospect (performance, etc.) can be considered in determining pretext.

Second, Plaintiff disputes many of the specific events, discussions and communications that allegedly led to her dismissal. Indeed, Plaintiff also disputes that she was ever specifically warned about having engaged in inappropriate Facebook or internet use. Part of what Defendants state was the reason for their frustration with Plaintiff's Facebook use as of February 2012 was that she had previously been caught and received warnings and was personally told by multiple superiors (including Bauer and Dr. Cohn) to stop using Facebook even before that date. *See* Tinanoff Decl. [113-1] ¶ 8. Defendants produced a document dated March 18, 2011, that purported to evidence a written warning from Bauer to Plaintiff about Facebook use. *See* Def. SOMF [112-2] ¶ 29.

But Plaintiff in her deposition disputes that the March 2011 incident occurred, or that she ever received a written warning from Bauer, or that Dr. Cohn or Bauer ever warned her specifically against inappropriate Facebook use. *See* Pl. Resp. [124] ¶ 29; Pl. Dep. [119-1] at 62-63. Thus, while Defendants contend that the February 2012

computer incident and the April 2012 cell phone incident were last straws, which occurred after "umpteenth" prior incidents, Def. SOMF [112-2] ¶ 41, Plaintiff offers testimony specifically denying that past history. If the jury were to believe Plaintiff and find that Defendants are fabricating warnings and reprimands after the fact, it could question whether Plaintiff was actually fired for this reason.[21]

As to her alleged poor performance, while Plaintiff acknowledges the 30-day probation period she served in 2010, she disputes that she received any criticism or negative review for "poor performance" in the years since that brief probation period.

_____

[21] Defendants place heavy emphasis on the Facebook records and other documentary evidence obtained in discovery, which according to Defendants shows that Plaintiff was in fact heavily using these social media internet sites during work hours. *See, e.g.,* Def. SOMF [112-2] ¶ 26. Defendants also point to specific posts on Facebook, allegedly made by Plaintiff, in which she appears to admit that she was using these services at work and that she knew she was not supposed to. *See, e.g., id.* ¶ 30. The undersigned disregards this evidence in assessing Defendant's non-retaliatory reasons for termination. While these facts may be damaging to Plaintiff's credibility at trial, or may be relevant in other ways, it remains that Defendants were unaware of these Facebook posts during Plaintiff's employment. By definition, therefore, this evidence sheds no light on Defendants' termination of Plaintiff. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) ("The employer could not have been motivated by knowledge it did not have . . . ."). That Defendants learned additional facts in discovery after-the-fact that would have supported or strengthened a decision to terminate Plaintiff does not establish lack of pretext.

Moreover, Plaintiff disputes through her own testimony that she was using company computers to log into Facebook, at least during working hours prior to the February 20, 2012 policy change. To the extent the Facebook records cited by Defendants contradict Plaintiff's testimony in that regard, that presents a quintessential factual dispute that the Court cannot resolve here.

Plaintiff argues that this contradicts the claim that she was fired in May 2012 for "repeated poor performance."

Whether Plaintiff was actually a poor performer is not directly at issue in this case. What is at issue is whether Defendants terminated Plaintiff based on a belief – accurate or not – that Plaintiff was a poor performer and/or repeatedly violated the internet policy and/or for some other non-retaliatory reason. *See Nix*, 738 F.2d at 1187 (an employer may make an employment decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). Thus, a plaintiff fired for poor performance cannot generally defeat summary judgment by offering her own subjective opinion that she performed well. But  the undersigned sees Plaintiff's point here as somewhat more substantial. That Plaintiff's brief performance-related probation period ended in 2010, and that, according to her, she received no subsequent performance-related criticism or negative review during the ensuing two years, and instead received increased responsibility and raises, *see* Pl. Aff. [125-1] ¶ 14, could be seen as contradicting Defendants' claim that Plaintiff was terminated her for repeated poor performance and failure to improve as of 2012. This might not constitute substantially probative evidence of pretext in and of itself but, in combination with everything discussed above, the Court finds that such evidence exists here. The undersigned therefore finds

that Plaintiff has pointed to evidence of pretext, and on that basis **RECOMMENDS** that Defendants' Motion be **DENIED** as to Count Three.

E.      COUNT FOUR: BATTERY

Plaintiff asserts a claim for Battery in Count Four. The "act of intentionally causing actual physical harm to another is civilly actionable as a battery . . ." *Everett v. Goodloe*, 268 Ga. App. 536, 543 (2004) (internal quotations and citation omitted). Defendant Bauer does not appear to seek summary judgment on this Count, nor could she credibly do so given the contested evidence as to the events on February 17, 2012. Rather, Defendants MVIM and Tinanoff, Cohn and Polekoff argue that they cannot be liable under this Count.

The plain language of Plaintiff's battery count, Count Four, accuses only Defendant Bauer of misconduct. Count Four alleges that "Defendant Bauer battered Plaintiff by intentionally making physical contact of an insulting or provoking nature with her person . . . ." Am. Cmplt. [64] ¶ 52. The Count also states "[a]s a result of *Defendant's* conduct Plaintiff is entitled to punitive damages." *Id*. ¶ 53 (emphasis added). The singular reference to "Defendant's" can only logically refer to Defendant Bauer, who was mentioned in the prior paragraph and is the only Defendant specifically named in this Count.

Nevertheless, in the body of the Complaint, Plaintiff alleges, albeit not specifically in relation to this Count or this conduct, that "[t]he Defendants (Tinanoff, Cohn, and Polekoff) are liable for Defendant Bauer's (sic) conduct pursuant to the Doctrine of Respondeat Superior. . . ." Am. Cmplt. [64] ¶ 15. Thus, the Court assumes that Plaintiff intended to sue the physician Defendants for Battery on this theory.

Defendants argue that MVIM is not even named in this Count, on a vicarious basis or otherwise, that the three doctors cannot be liable because they had no employment relationship with Bauer, and that they cannot be held individually liable for MVIM's liability because the company is a limited liability partnership. *See* Def. Brf. [112-1] at 50 (citing O.C.G.A. § 14-8-15(b)). Plaintiff offers a vague and largely non-responsive statement, writing only that "the physicians were aware of the battery, as well as Plaintiff's complaint. They met with Ms. Bauer, on numerous occasions, concerning Plaintiff; yet they made no effort to address the issues." Pl. Resp. [123-1] at 35.

Because Plaintiff does not respond to and address the specific legal arguments relied upon by Defendants, the Court could recommend that summary judgment be granted on this points as unopposed. *See* LR 7.1B, NDGa. More importantly, however, Defendants' arguments are correct and justify the grant of summary judgment on the merits.

"For the negligence of one person to be properly imputable to another, the one to whom it is imputed must stand in such a relation or privity to the negligent person as to create the relation of principal and agent." O.C.G.A. § 51–2–1(a).  Plaintiff does not establish that the physician Defendants themselves qualified as Bauer's employers, and that she was their personal agent, and therefore that the physician Defendants possessed the relationship required to establish vicarious tort liability. *See MCG Health, Inc. v. Nelson*, 270 Ga. App. 409, 413 (2004) (internal citations and quotations omitted). To the contrary, the undisputed facts establish that MVIM was both Bauer's and Plaintiff's "employer" in this case. Def. SOMF ¶ [112-1] ¶¶ 1, 15. Moreover, while arguably MVIM could be held vicariously liable for Bauer's actions, Plaintiff does not sue MVIM in this Count, and O.C.G.A. § 14-8-15 generally protects the individual partners from exposure to the tort liability of the partnership as a whole:

> (b) Subject to subsection (c) of this Code section and to any contrary agreement among the partners, a partner in a limited liability partnership is not individually liable or accountable either directly or indirectly by way of indemnification, reimbursement, contribution, assessment, or otherwise for any debts, obligations, or liabilities of or chargeable to the partnership or another partner, whether arising in tort, contract, or otherwise, that are incurred, created, or assumed while such partnership is a limited liability partnership, solely by reason of being such a partner or acting or omitting to act in such capacity or otherwise participating in the conduct of the activities of the limited liability partnership. Notwithstanding the provisions of this subsection, a partner may be personally liable for tax liabilities arising from the operation of the limited liability partnership as provided in Code Section 48-2-52.

(c) Subsection (b) of this Code section shall not affect the liability of a partner in a limited liability partnership or the liability of the limited liability partnership for such partner's own errors, omissions, negligence, malpractice, wrongful acts, incompetence, or misconduct.

O.C.G.A. § 14-8-15(b)-(c).

Plaintiff does not make any argument or adduce any specific fact to justify liability for the individual physician Defendants under these standards. The undersigned thus **RECOMMENDS** that Defendants' Motion [112] be **GRANTED** as to Count Four, which would result in that Count proceeding to trial against Defendant Bauer alone.

E.    COUNT FIVE: ASSAULT

Plaintiff in Count Five seeks relief for Assault. An assault "occurs when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another." *Everett*, 268 Ga. App. at 543 (internal quotations and citation omitted). Thus, "no actual injury need be shown, it being only necessary to show an intention to commit an injury, coupled with an apparent ability to do so." *Wallace v. Stringer*, 250 Ga. App. 850, 853 (2001) (internal quotations and citation omitted).

84

All Defendants, including Bauer, move for dismissal of this Count.  Defendants globally argue that Plaintiff cannot bring a claim for Assault because Plaintiff had her back to Defendant Bauer when Bauer allegedly battered Plaintiff. Thus, "[b]ecause her back was turned, it is impossible for . . . [Plaintiff] to have been apprehensive of any contact. Accordingly, her assault claim must fail." Def. Brf. [112-1] at 51.

Plaintiff, in response, does not claim that she was apprehensive of Bauer's attack before it happened. Rather, Plaintiff argues that Bauer's actions put Plaintiff in reasonable apprehension that she would be hit again. *See* Pl. Resp. [123-1] at 36. Plaintiff cites her affidavit testimony that "Linda was screaming and cursing at me. I was afraid of what she would do next. I didn't know if she was going to physically hit me again or if I still had my job." Pl. Aff. [125-1] ¶ 10. The Court agrees that this evidence establishes enough to survive summary judgment on this Count against Bauer.

As to the physician Defendants, Plaintiff again argues that "the Defendant-physicians were aware of Ms. Bauer's conduct, and they failed to intervene. Their failure to intervene resulted in the assault. Therefore, Defendant's [sic] Motion for Summary Judgment . . . on Plaintiff's Assault count should be denied." Pl. Resp. [123-1] at 36. Again, only Defendant Bauer is named as committing the tort in question in Count Five. Therefore, at most, the physician Defendants can be held liable for this

conduct on the basis of vicarious liability. The Court, for all of the reasons discussed above with regard to Count Four, finds that Plaintiff has not substantiated a vicarious or direct liability claim against the physician Defendants and that summary judgment should be awarded in their favor on Count Five. Thus, Defendants' Motion should be **DENIED IN PART, GRANTED IN PART** as to Count Five, with the result that the Count should proceed to trial solely against Defendant Bauer.

F.   COUNT SIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff in Count Six seeks relief for Intentional Infliction of Emotional Distress ("IIED"). Plaintiff appears to assert this claim against all five Defendants. *See* Am. Cmplt. [64] ¶ 59 ("Defendants' conduct was extreme and insulting, so as to naturally cause humiliation, embarrassment and fear on the part of Plaintiff such that Plaintiff is entitled to recover damages for emotional distress caused by Defendants' conduct.").

The elements of IIED are: (1) the conduct in question must be intentional or reckless; (2) the conduct must be extreme or outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *See Hendrix v. Phillips*, 207 Ga. App. 394, 395

(1993). "The burden which the plaintiff must meet . . . to prevail in this cause of action is a stringent one." *Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 229 (1985).

Defendants argue that Plaintiff cannot fulfill the second and fourth elements of this claim. *See* Def. Brf. [112-1] at 53-57. The undersigned thus treats the first and third elements as met.

       1.     Extreme or Outrageous Conduct

To meet this element, "[t]he defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Whether a claim rises to the requisite level of outrageousness . . . to sustain a claim for intentional infliction of emotional distress is a question of law." *Blue View Corp. v. Bell*, 298 Ga. App. 277, 291 (2009).

Defendants base their argument as to this element on Plaintiff's Statement of Emotional Distress [102-1], which the Court ordered Plaintiff to file in order to guide its *in camera* review of Plaintiff's Facebook postings. Plaintiff there alleged that her emotional distress began in October 2010 and "tapered off on or about August 14, 2012 when she started to receive unemployment benefits." Pl. Stmt. [102-1] at 1-2. Plaintiff attributes her emotional distress to an excessive workload; Defendant Bauer's alleged battery and related cursing at Plaintiff on February 17, 2012; Plaintiff's stress after that incident; and Bauer's alleged reaction to Plaintiff's filing of discrimination

charges with the EEOC. *See id*. Defendants argue that none of these actions, if true, qualifies as sufficiently outrageous for liability to obtain. *See* Def. Brf. [112-1] at 54-55.

Plaintiff responds that three acts qualify as outrageous: Bauer's alleged battery of Plaintiff ("This conduct was extreme and outrageous per se as a matter of law because battery is a crime."); Dr. Tinanoff's "summarily" dismissing Plaintiff and referring Plaintiff to Dr. Cohn when Plaintiff reported Bauer's conduct; and Dr. Cohn being "more concerned with the fact that . . . [Plaintiff] called the police than the fact that Plaintiff had been hit at her place of work by her immediate supervisor." Pl. Resp. [123-1] at 38.

The undersigned finds that none of the acts to which Plaintiff points are sufficiently outrageous to fulfill this element.

First, Bauer's alleged battery of Plaintiff does not qualify as extreme and outrageous. While Plaintiff argues that this action is "outrageous per se as a matter of law because battery is a crime," Plaintiff fails to cite any authority to support that contention. Even accepting Plaintiff's version of events, *see* Pl. SOMF [123-2] ¶¶ 14, 15, 18, a single incident of one person hitting another with a stack of files, and then apologizing, Def. SOMF [112-2] ¶ 49, is not so extreme as to meet this element. Accepting Plaintiff's version of events, Plaintiff's took over-the-counter medication

for the pain she suffered, and "her back hurt for a couple of days." Pl. SOMF [138] ¶ 18. The undersigned does not find that this meets the strict threshold delineated above.

Second, Plaintiff argues that Dr. Tinanoff behaved outrageously when she referred Plaintiff to Dr. Cohn when Plaintiff complained about the attack. *See* Pl. Resp. [123-1] at 38. Plaintiff's other related proposed material fact asserts that "On February 23, 2012, when Plaintiff went to talk to Dr. Tinanoff, she told her to talk to Dr. Cohn." Pl. SOMF [138] ¶ 21. Plaintiff writes that Tinanoff did this "because she was not on rotation as the Personnel Manager at the time." Pl. Resp. [123-1] at 38. Plaintiff cites no authority to support the position that Dr. Tinanoff's referral of Plaintiff to another partner was extreme or outrageous. This conduct, recited to an average member of the community, would not likely arouse that person's resentment to the point where they would exclaim, "Outrageous!" *Wilcher v. Confederate Packaging, Inc.*, 287 Ga. App. 451, 453 (2007).

Third, Plaintiff argues that Dr. Cohn "was more concerned with the fact that [Plaintiff] called the police than the fact that Plaintiff had been hit at her place of work by her immediate supervisor." Pl. Resp. [123-1] at 38. Again, Plaintiff cites no authority to support this contention. Plainly, these facts fail to meet the high standards of showing extreme or outrageous conduct. That Cohn and/or Tinanoff did not believe

Plaintiff, did not take Plaintiff's allegations as seriously as they should have, tried to avoid dealing with the problem, or seemed to be more concerned about the involvement of the police, are at most acts of negligence or poor management and do not establish liability for this intentional tort. *See Wilcher*, 287 Ga. App. at 453. The undisputed facts, moreover, also indicate that the physician Defendants investigated the incident, reprimanded Bauer and required Bauer to attend anger management training. Def. SOMF [112-2] ¶ 53. On this evidence, the undersigned cannot find that Cohn's or Tinanoff's conduct rises to the high level of extreme and outrageous behavior.

2.      Severe Emotional Distress

"The severity of the emotional distress allegedly produced by the conduct is . . . a factor in determining liability for this tort . . . . It is only where it is extreme that liability arises . . . . The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it . . ." *Bridges*, 176 Ga. App. at 230.

Defendants again frame their opposition to this Count in terms of Plaintiff's Statement of Emotional Distress [102-1]. Plaintiff there states that she experienced stress from a heavy workload; shock when Bauer "cursed at her and struck her[,]" thus causing her to cry and feel "like a child, shameful, and embarrassed"; and discomfort,

paranoia and fear over losing her job after filing charges with the EEOC. Pl. Stmt. [102-1] at 2. Defendants argue these assertions are insufficient under governing law, in part because Plaintiff did not complain of any physical manifestations of emotional distress and because Plaintiff never sought treatment for her distress. *See* Def. Brf. [112-1] at 56-57. Defendants also argue that there is no record evidence to support an assertion that Plaintiff suffered severe distress, and that Plaintiff's social media postings do not reflect any grief, shame, humiliation, embarrassment or fear of losing her job. *See id*.

Plaintiff responds that "she suffered severe emotional stress because she had feelings of being overwhelmed and feelings of hopelessness." Pl. Resp. [39] at 39. When Plaintiff's filing of charges with the EEOC "provoked Ms. Bauer's wrath, Plaintiff turned to the church and leaned on her spirituality. But she . . . also . . . found solace in drinking . . ." *Id*.

Plaintiff points to certain of her Facebook posts in Defendant's Exhibit O [114-6] to support this contention, including the following:

- "last day of wrk til Thursday!!#turnup!" Ex. O [114-6] at 54.
- "Its Friday an im ready to #turnup!!" *Id.* at 56.
- "thank God!! Im off,,,today was not a good day..." *Id.* at 57.
- "God plz deliver me...so tired of it!!" *Id.* at 58.
- "Njoyd church today...everybody b blessed!" (Pl. Ex. D [129-1] at 1).[22]
- "Getn ready 4 church......Everybody hav a blessed day! (*Id.* at 2).
- "I enjoyed church 2day cried a lil bit shoutd liftd my hands Lord I'm cumin out tha BOX!" (*Id.* at 3).
- "enjoyed church 2day.....increase prayers! (*Id.* at 4).
- "went 2 church 2ay.....gotta stay prayd up." (*Id.* at 5).
- "Don't pray 4 problems 2 go away.....pray 4 courage n strength 2 ovacum dem." (*Id.* at 6).
- "Trusting in God wont mke the mountain smaller.....but wil mke climbin easier.....Don't ask him 4 a lighter load....ask him 4 a stronger back!!!" (*Id.*).
- "Getn ready 4 church....gota stay prayd up cause the devil is busy!!! (Pl. Ex. D [129-1] at 7).

The Court agrees with Defendants that neither Plaintiff's testimony nor these smatterings of contemporaneous social media posts establish the requisite level of extreme emotion distress "so severe that no reasonable person could be expected to endure it." *Everett v. Goodloe*, 268 Ga. App. 536, 545 (2004). This is not to minimize Plaintiff's stress at being terminated, having Bauer threaten to fire her, or being struck with medical files. The Court by this Report and Recommendation makes no

---

[22] These statements, and the ones that follow, are the subject of Defendants' Motion to Strike [141]. The Court, adopting the approach most favorable to Plaintiff, considers these statements as part of Plaintiff's argument, but, as explained herein, finds that they fail to provide evidence of extreme emotional distress. Thus, Defendants' Motion to Strike should be denied (as moot).

recommendation one way or the other as to the viability of any claim of emotional distress damages as part of the compensatory damages sought under the remaining claims of this case. But these facts simply do not rise to the level of being so extreme as to justify the additional tort of Intention Infliction of Emotional Distress. The undersigned thus **RECOMMENDS** that Defendant's Motion [112] be **GRANTED** as to Count Six.

G.    COUNT  SEVEN:  CONSPIRACY  TO  INTERFERE  WITH EMPLOYMENT RELATIONS

Plaintiff has abandoned her claim in Count Seven. *See* Pl. Resp. [123-1] at 40. The undersigned therefore **RECOMMENDS** that Defendants' Motion be **GRANTED** as to this Count.

## IV.    CONCLUSION

For the reasons stated above, the undersigned **ORDERS AND RECOMMENDS** as follows:

The undersigned **DENIES** Defendants' Motion to Strike Plaintiff's Affidavit [139]; Plaintiff's Motion to Strike Exhibits [133]; Defendants' Motion to Strike Plaintiff's Exhibit D [141]; Plaintiff's Motion to File a Sur Reply [171]; and Defendants' Motion to Strike Plaintiff's Surreply Brief [174].

The undersigned **RECOMMENDS** that Defendants' Motion [112] be **GRANTED** as to Counts One, Two, Four, Five, Six and Seven. The undersigned further **RECOMMENDS** that Defendants' Motion [112] be **DENIED** as to Count Three. As a result, if this Recommendation is adopted, the case will proceed to trial as to Count Three (Retaliation), and Counts Four (Battery) and Five (Assault) as to Defendant Bauer alone.[23]

 **IT IS SO ORDERED AND RECOMMENDED** this 1st day of August, 2014.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

[23] If the District Judge disagrees with the undersigned's recommendation as to Count Three and grant summary judgment to Defendants on that Count, then only state tort claims would remain in this action. While the Court could exercise discretion to maintain jurisdiction over this matter under Supplemental Jurisdiction, *see* 28 U.S.C. § 1367, despite the lack of any federal question or apparent diversity of citizenship, the Supreme Court has stated that the best course in these circumstances would be to dismiss the case without prejudice to the remaining state law claims being re-filed in state court. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Thus, if only state law tort claims were to survive this motion, the undersigned would recommend such a dismissal to allow the remaining claims to proceed in state court.